EVAN D. CAMERON, *as Superintendent of Public Instruction and Ex-officio Auditor of Oklahoma Territory,* vs. J. H. PARKER.

1. MANDAMUS—*Office, Title to—Mandamus* will not lie to try the title to a public office. (*Ewing vs. Turner,* 35 Pac. Rep. 951.)

2. SAME—It may be stated as a general rule, in an action in *mandamus,* that, where a relator shows a *prima facie* title to a public office, he is entitled to the aid of *mandamus* to obtain possession of the books, records, insignia, paraphernalia, and official belongings of such office; and in granting the writ the court will not go behind such showing, and try the title thereto. (*Ewing vs. Turner, supra.*)

3. GOVERNOR—*Officer Removed by—Courts Have no Power to Review His Actions*—So long as the governor's action in removing an officer is within the limits of the power conferred upon him by statute, the courts cannot interfere to arrest his action or review the proceedings before him. He is the exclusive judge, so far as the courts are concerned, of the sufficiency of the proof of the charges, and his findings are not reviewable by any court.

4. CONSTITUTION—That clause of the bill of rights, that "no person shall be deprived of life, liberty or property, without due process of law," is not infringed by a statute giving the governor power to remove a superintendent of public instruction from office for incompetency, neglect of duty, or malfeasance in office, without a trial in a court of law, there being no such thing as title or property in a public office, within the meaning of that section.

5. PUBLIC OFFICER—*Removal of*—The power conferred on the governor of the territory by § 5976, Statutes of 1893, is administrative and not judicial, and, therefore, not in conflict with § 9 of the Organic Act conferring judicial power on the courts of the territory.

6. APPOINTMENT—*Removal of Officer*—No one has a right of property in an office such as would bar the executive from removing him, if cause presented, where the statute confers that power, or even without a statute, an executive officer may exercise the power of removal, unless expressly prohibited, for the power of appointment, under the law, carries with it the power of removal under the law.

### Original Proceeding in Mandamus.

The opinion of the court was delivered by

SCOTT, J.: On the 23d day of February, 1894, Evan D. Cameron, as superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, filed his petition and affidavit for a writ of *mandamus* against J. H. Parker, in this court, praying that an alternative writ issue, commanding said defendant, J. H. Parker, on service thereof, to forthwith deliver to him all office furniture and fixtures, seal, books, records, files and other property, of every kind or character, belonging or pertaining to the office of superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, as aforesaid, or, on default thereof, to be and appear before the supreme court of Oklahoma Territory, on the 1st day of March, 1894, at 10 o'clock A. M., to show why he has not so rendered obedience as commanded in said writ.

The writ was allowed by Associate Justice Scott, which, embracing all exhibits, and ommitting caption and attestation, reads as follows:

"*The Territory of Oklahoma, to J. H. Parker, Greeting:*

"Whereas, it has been made to appear to said court and the Hon. Henry W. Scott, associate justice thereof, by the petition and affidavit of the plaintiff, Evan D. Cameron, that you, the said J. H. Parker, were, on the 21st day of February, 1894, the duly qualified and acting superintendent of public instruction, and ex-officio auditor of the Territory of Oklahoma; that on said day, acting upon charges filed, and after due no-

tice and hearing, his excellency, William C. Renfrow, governor of the Territory of Oklahoma, removed you, the said Parker, from said office for cause, to-wit: malfeasance in office and neglect of duty, a copy of said order of removal, made as aforesaid, is hereto attached, marked 'Exhibit A', and made a part of this writ; that thereby said office became and was vacant; that afterwards, on said 21st day of February, the plaintiff, Evan D. Cameron, was duly appointed and commissioned as superintendent of public instruction, and ex-officio auditor of the Territory of Oklahoma, vice J. H. Parker, removed; that a copy of said commission is hereto attached and marked 'Exhibit B,' and made a part of this writ; that after the appointment aforesaid, and on the same day, said plaintiff, Evan D. Cameron, qualified as such officer by filing the bonds and subscribing the oath of office required by law; that he then and there became and now is the legally qualified incumbent of said office.

"That the said defendant, Parker, after his removal from the office of superintendent of public instruction and ex-officio auditor as aforesaid, retained the exclusive possession of, and continues to retain in his custody and control, all the property and effects belonging to said office, consisting as nearly as can be described, of office furniture and fixtures, a safe, books, records, files, seal and other paraphernalia belonging to said office of superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma; that demand has been made on said defendant, Parker, by the said plaintiff, Cameron, for the possession of said property, paraphernalia and effects belonging to said office, and said Parker wrongfully refused and still wrongfully and unlawfully refuses to deliver the same or any part thereof to the plaintiff; that a copy of said demand, with the affidavit of service by said Evan D. Cameron, is hereto attached marked 'Exhibit C' and made a part of this writ; that by reason of said wrongful and unlawful refusal to deliver said property belonging to said office as aforesaid, the plaintiff is unable to properly discharge his official duties; that he has no adequate remedy at law by which to obtain possession of said property and effects; that unless the relief asked for is granted

great injury will result to the public having business with said office, and irreparable injury and damage will be done the plaintiff herein:

"Now, therefore, being willing that full and speedy justice shall be done in the premises, we do command you, the said J. H. Parker, that forthwith on the service of this writ you deliver to the plaintiff, Evan D. Cameron, superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, the office furniture and fixtures, the seal, books, records, files, safe and all other property and paraphernalia pertaining or in anywise belonging to said office, or that you shall show cause to the honorable supreme court of the Territory of Oklahoma, at its session at 10 o'clock A. M., on the 1st day of March, 1894, at the city of Guthrie, why you have not done so; and have you then and there this writ with your return that you have done as you are hereby commanded.

"(Signed)                    HENRY W. SCOTT,

"Associate Justice of the Supreme Court of the Territory of Oklahoma."

"Exhibit A.

"EXECUTIVE OFFICE, February 21, 1894.

"In the matter of the charges and specifications of malfeasance in office and neglect of duty against J. H. Parker, territorial superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma.

"Certain charges and specifications having been preferred against J. H. Parker, superintendent of public instruction and ex-officio auditor, charging malfeasance and neglect of duty, and duly filed in this office, and afterwards certain amended and supplemental charges were filed and a copy of said charges and specifications, as well as the amended and supplemental charges and specifications, having been served on said J. H. Parker, together with a notice of the filing of the same in this office, and said J. H. Parker was given until the 29th day of August, 1893, to file his answer or any other explanation he might desire to make to said charges and specifications. On the 29th day of August, 1893, said Parker appeared at this office in person and by his attorneys, and presented

his written objection to the authority of the governor to examine into this matter, which objection was overruled and the said Parker asked for further time to prepare and file a written answer to said charges and specifications, which request for time was granted, and on the 6th day of September, 1893, said J. H. Parker appeared in person and by his attorneys and filed his answer and explanation in writing to said amended charges and specifications.

"After carefully examining and fully investigating said answer and explanation and said matter coming on this day to be further considered, and it appearing that said charges and specifications filed against said Parker, as superintendent of public instruction and ex-officio auditor of said territory, and the evidence submitted in support thereof, and also the answer of said Parker and his explanation of said charges, I find that the allegations of malfeasance in office contained in charge No. 1 and specifications thereunder, have been fully made out and sustained, in this, to-wit.: That said Parker, as such superintendent and auditor, illegally and wrongfully audited and allowed certain accounts for mileage and expenses of the board of regents of the Oklahoma Agricultural and Mechanical college, and also audited and wrongfully allowed certain accounts of said regents for per diem and mileage; and also audited and wrongfully allowed certain accounts of the State Capital Printing Co., for printing the laws of the last legislative assembly of the Territory of Oklahoma, beyond the maximum fixed by law; and I further find that the allegation of neglect of duty, contained in charge No. 2, to have been fully made out and sustained, and no further investigation or hearing and no exercise of judicial power being necessary to the finding and establishing of said charges of malfeasance and neglect of duty, it is considered that said charges ought to be and have been sustained and that the same are sufficient cause, as fixed by statute, for the removal of said J. H. Parker from office.

" Therefore, by the power vested in me by the Organic Act of the Territory of Oklahoma, and the laws enacted thereunder, it is ordered that said J. H. Parker should be and he is, hereby removed from the office of

superintendent of public instruction and ex-officio aud-
itor of the Territory of Oklahoma.

"In testimony whereof I have hereunto set my hand
and caused the grand seal of the territory to be
affixed at the city of Guthrie, this 21st day of Febru-
ary, A. D. 1894.        WILLIAM C. RENFROW,
"Attest:                        Governor of Oklahoma.

"THOMAS J. LOWE,
        "Secretary.

"Exhibit B.

"*To All Who See These Presents, Greeting:*

"Know ye, that reposing special trust and confi-
dence in the ability and integrity of Evan D. Cam-
eron, I have appointed and do hereby commission him
superintendent of public instruction and ex-officio
auditor of the Territory of Oklahoma, and do author-
ize and empower him to execute and fulfill the duties
of that office according to law and to have and to hold
the said office with all powers, privileges and emolu-
ments thereunto appertaining unto him, the said Evan
D. Cameron, to fill the unexpired term of J. H. Parker,
removed.

"In testimony whereof I have caused these letters to
be made patent, and the great seal of the territory to
be hereunto affixed.

"Given under my hand at the city of Guthrie, the
21st day of February, in the year of our Lord one
thousand eight hundred and ninety-four and of the in-
dependence of the United States of America the one
hundred and eighteenth.

        "By the governor:   WILLIAM C. RENFROW.

"THOMAS J. LOWE,
        "Secretary of the Territory.

"I, Thomas J. Lowe, secretary of the Territory of
Oklahoma, do hereby certify the above and foregoing
to be a true and correct copy of the commission of
Evan D. Cameron, as superintendent of public in-
struction and ex-officio auditor of the Territory of Ok-
lahoma.

"Issued on the 21st day of February, 1894.

"Witness my hand and the grand seal of the territory of Oklahoma Territory.

"Done at Guthrie this February 23, 1893.

" [SEAL.]                                THOMAS J. LOWE,
                                                "Secretary.

" Exhibit C.

"GUTHRIE, O. T., February 21, 1894.

"Rev. J. H. Parker, city.—Sir:   You are hereby notified that I, Evan D. Cameron, have this day been appointed superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, by the governor of said territory; that I have duly qualified as such official by filing the bonds and subscribing the oath of office required by law, and demand is hereby made on yon for the possession of all the books, records, files, seal, property and effects of every kind or character belonging or pertaining to said offices of superintendent of public instruction and ex-officio auditor.                            E. D. CAMERON,
"Superintendent of Public Instruction and Ex-officio Auditor.

"TERRITORY OF OKLAHOMA, OKLAHOMA COUNTY, SS:

"Evan D. Cameron, of lawful age, on his oath, says, that on the 21st day of February, 1894, at the city of Guthrie, Logan county, Territory of Oklahoma, he delivered to J. H. Parker in person a true and correct copy of the above and foregoing notice and demend.
                                        "E. D. CAMERON.

"Subscribed and sworn to before me this 23d day of February, 1894.

" (SEAL.)                                W. H. EBEY,
            "Clerk District Court, Third district.
"By OLLIE E. CRAMER,
                "Deputy.

" Exhibit D.

"To Hon. J. H. Parker, Territorial Superintendent of Public Instruction and ex-Officio Auditor.

"Sir:   You will please take notice that the accompanying charges and specifications against you have been filed with the undersigned as governor of the

Territory of Oklahoma and that you will be given an opportunity to answer or explain the same at the governor's office in the city of Guthrie on the 29th day of August, 1893, at 2 o'clock P. M.

"W. C. RENFROW,

"Governor.

"By agreement of attorneys, made in open court this 3d day of March, 1894, the above notice was filed and made Exhibit 'D' to the alternative writ issued in the case of *Cameron vs. Parker*, pending in the supreme court of the Territory of Oklahoma."

On the 1st day of March, 1894, the plaintiff filed a motion to set aside and quash the alternative writ of *mandamus*, assigning therefor the following reasons:

"1. Because the court had no jurisdiction to grant the relief prayed for.

"2. Because said writ fails to state facts sufficient to entitle the plaintiff to the relief sought.

"3. Because said writ did not state facts sufficient to constitute a cause of action against the defendant in favor of the plaintiff.

"4. Because as shown on the face of said writ and upon the allegations and statements therein contained, said plaintiff has a plain, speedy and adequate remedy at law."

This motion the court overruled and thereupon the defendant, on the 3d day of March, 1894, filed the following return to the alternative writ, which, omitting caption, reads as follows, to-wit:

"Comes now J. H. Parker, defendant in the above entitled cause, and for his return to the alternative writ of *mandamus* heretofore issued therein, respectfully states to the honorable court:

"1. That he denies each and every allegation, averment and statement made and contained in said alternative writ of mandamus and the exhibits thereto attached not hereinafter specifically admitted.

"2. For second and further return to said alternative writ, the said J. H. Parker respectfully says, that heretofore, to-wit: on the third day of February, 1893,

the Hon. A. J. Seay, then governor of the Territory of Oklahoma, nominated and by and with the advice and consent of the council of the Territory of Oklahoma, then in session, appointed him superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma for the term of two years, and duly and legally issued to him a commission as such officers; and from that time until the present has exercised the functions of said office, and in all things honestly, conscientiously and properly discharged his official duties; and therefore admits that on the 21st day of February, 1894, he was the duly qualified and acting superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, that during all the time aforesaid as such superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma he has had and retained the exclusive possession of, and continues to retain in his custody and control, all the property and effects belonging to said office, consisting of office furniture and fixtures, safe, books, records, files, seal and other paraphernalia belonging to said office of superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma; that on the 21st day of February, 1894, in the city of Guthrie, county of Logan and Territory of Oklahoma, Evan D. Cameron, mentioned in said alternative writ and the exhibits thereto attached, served upon him, by delivering a true copy thereof, the alleged notice and demand, marked 'exhibit C,' and made a part of said alternative writ, and this defendant refused, and still refuses, to deliver to the said Evan D. Cameron the possession of all the books, records, files, seal, property and effects of every kind and character belonging or pertaining to the said office of superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, or to deliver to him any part thereof, for the reason, as defendant avers, that the said J. H. Parker now is, and during all the time herein aforesaid has been, superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, having at no time resigned as such officer, or died, or in any legal manner or by any competent authority been removed, and for the further reason that the said Evan D. Cameron has not,

at any time, been legally appointed to such offices by any competent authority, and for the reason that this defendant's commission to said office, not having expired, and being in active discharge of his duties as such officer, he is entitled to retain possession of all the property and insignia of said office, and the said Evan D. Cameron, not holding such offices, is not entitled to the possession of said property or any part thereof; and defendant further respectfully avers and admits that on the 21st day of February, 1894, there was delivered to him the alleged notice of removal of which exhibit 'A' to said writ is a copy; that heretofore, towit, on the 4th day of September, 1893, and subsequent thereto, by amendment, certain charges and specifications were preferred against him, as such officer, charging him with malfeasance in office and neglect of duty, by allegations thereof setting for+h specific matters in support of such allegations, all of which were filed with his excellency, W. C. Renfrow, then governor of the Territory of Oklahoma, a copy of which said charges and specifications, as well as the amendment and supplemental charges and specifications, were served upon him, together with a notice of the filing of the same as aforesaid, and giving him time thereafter to appear thereto, by answer or other explanation; that afterwards on the — day of——, 1893, he, the said defendant, by his attorneys, appeared at the office of his excellency, the governor, and presented and filed his written demurrer and objection to the power, authority and jurisdiction of his excellency, the governor, to examine into said matter or take any cognizance thereof or action thereon, which demurrer and objection was overruled and this defendant granted time to file an answer and explanation in writing to such alleged charges and specifications, which he thereafter, on or about the — day of September, 1893, did, and defendant avers that from the time he filed said answer and explanation up to the 21st day of February, 1894, he had no notice of any further action or proceedings being taken or had in relation thereto, and, therefore, avers that at no time had he a hearing upon said alleged charges and specifications before his excellency, the governor, or any opportunity to appear and present evidence or defend

himself against the same, and that if any hearing was had thereon, it was without notice to him and without any opportunity whatever having been given him to appear at such hearing, and he specifically denies that as such officer he ever illegally and wrongfully audited and allowed certain accounts for mileage and expenses of the board of regents of the Oklahoma Agricultural and Mechanical college, or audited and wrongfully allowed certain accounts of said regents for per diem and mileage, or audited and wrongfully allowed certain accounts of the State Capital Printing Co., for the printing of the laws of the last session of the legislative assembly of the Territory of Oklahoma beyond the maximum or the amounts fixed and allowed by law, or that he has at any time been guilty of neglect of duty as such officer, or that the allegations of neglect of duty, contained in charge No. 2, to have been fully made out or sustained, or that he has at any time been guilty of malfeasance in office or neglect of duty as such officer; he therefore says that he ought not to be deprived of his possession of the property and insignia of his said office.

"Wherefore, he prays that the prayer of the plaintiff herein be denied and for all other and proper relief.                                          J. H. PARKER.

"Sworn and subscribed before me this 28th day of February, 1894.                        ALFRED S. DEWITT,
                                             "Notary Public.
"[SEAL.]        Commission expires January 22, 1895."

The case was thereupon taken by the court upon briefs and oral argument. Peremptory writ of *mandamus* awarded.

*C. A. Galbraith, Attorney General, Green & Strang* and *Wisby & Hornor*, for plaintiff.

*Harper S. Cunningham* and *S. L. Overstreet*, for defendant.

The opinion of the court was delivered by

SCOTT, J.: This is an original action in *mandamus*

commenced in this court on the 23d day of February, 1894, by Evan D. Cameron, as superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma. On the same date an alternative writ of *mandamus* issued, returnable to the full bench on the 1st day of March, A. D., 1894. On March 3, 1894, the return was filed, and after disposition of dilatory questions, the matters in issue were thereupon properly before us for determination.

The facts, as pleaded, are quite voluminous; as alleged, established and admitted, and as shown in the statement of the case, are substantially, that, on the 3d day of February, A. D., 1893, the defendant, J. H. Parker, was nominated for the position of territorial superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma, by A. J. Seay, governor of said Territory, and thereafter was duly confirmed by the territorial council as provided by law. Subsequently Wm. C. Renfrow, governor, the successor of Governor Seay, on the 21st day of February, 1894, after due notice to the defendant of the filing of the charges against him, and after a hearing and determination of said charges, issued an order removing said defendant, J. H. Parker, from such office, and on February 23, of the same year, appointed the plaintiff, Evan D. Cameron, as defendant's successor. In pursuance of said appointment plaintiff filed his bond, took and subscribed the oath of office and in all respects duly qualified as superintendent and ex-officio auditor as provided and required by law, and upon receipt of the governor's commission to him, made formal demand for the possession of the books, records, muniments, insignia, paraphernalia and belongings of said offices. Charges and specifications were preferred against the defendant and a hearing had thereon in the executive office, and upon these, the governor made the following findings of fact:

"Certain charges and specifications having been preferred against J. H. Parker, superintendent of public instruction and ex-officio auditor, charging malfeasance and neglect of duty, and duly filed in this office, and afterwards certain amended and supplemental charges were filed and a copy of said charges and specifications, as well as the amended and supplemental charges and specifications, having been served on said J. H. Parker, together with a notice of the filing of the same in this office, and the said J. H. Parker was given until the 29th day of August, 1893, to file his answer or any other explanation he might desire to make to said charges and specifications. On the 29th day of August, 1893, said Parker appeared at this office, in person and by his attorneys, and presented his written objection to the authority of the governor to examine into this matter, which objection was overruled, and the said Parker asked for further time to prepare and file a written answer to said charges and specifications, which request for time was granted, and on the 6th day of September, 1893, said J. H. Parker appeared in person, and by his attorneys, and filed his answer and explanation in writing to said amended charges and specifications.

"After carefully examining and fully investigating said answer and explanation, and said matter coming on this day to be further considered, and it appearing that said charges and specifications filed against said Parker as superintendent of public instruction and ex-officio auditor of said territory, and the evidence submitted in support thereof, and also the answer of said Parker and his explanation of said charges, I find that the allegations of malfeasance in office contained in charge No. 1, and specifications thereunder, have been fully made out and sustained, in this, to-wit: That said Parker, as such superintendent and auditor, illegally and wrongfully audited and allowed certain accounts for mileage and expenses of the board of regents of the Oklahoma Agricultural and Mechanical college, and also audited and wrongfully allowed certain accounts of said regents for per diem and mileage; and also audited and wrongfully allowed certain accounts of the State Capital Printing Co., for printing the laws of the last session of the legislative assembly

of the Territory of Oklahoma, beyond the maximum fixed by law, and I further find that the allegation of neglect of duty, contained in charge No. 2, to have been fully made out and sustained, and no further investigation or hearing and no exercise of judicial power being necessary to the finding and establishing of the said charges of malfeasance and neglect of duty, it is considered that said charges ought to be, and have been, sustained and that the same are sufficient cause, as fixed by statute, for the removal of said J. H. Parker from office.

"Therefore, by the power vested in me by the Organic Act of the Territory of Oklahoma and the laws enacted thereunder, it is ordered that said J. H. Parker should be, and he is, hereby removed from the office of superintendent of public instruction and ex-officio auditor of the Territory of Oklahoma."

The defendant after removal, upon demand as above stated, refused and still refuses to give up the effects and belongings of the office, and the question for us to determine is, whether the peremptory writ shall issue compelling him to do so.

The determination of this controversy incidentally, if not primarily, involves the question of the power of the executive to remove an officer once appointed by him and confirmed by the council, as required by law, and this the defendant vigorously assails as the trial of the title to such office by *mandamus*.

The vital point at the outset for our determination is, whether the questions, presented as they are, involve a trial of the title to this office to such an extent that *mandamus* will not lie, or whether *mandamus* is a proper remedy for the relief sought; or has the plaintiff a plain and adequate remedy at law?

The office of this writ is not materially changed from its functions at common law, and in treating of it as applicable to this case, we are not circumscribed by any statutory provisions.

The writ of *mandamus* is of very ancient origin.    It

was a prerogative writ, issued in the king's name, from the court of king's bench.     It was directed to any person, corporation or inferior court, commanding some particular act or thing, in said writ set out, which the court had determined to be consonant with right and justice.     Blackstone, book 3, 110, says:

" It is a high prerogative writ of a most extensively remedial nature; and may be issued in some cases where the injured party has also another more tedious method of redress, as in case of admission or restitution to an office; but it issues in all cases where the party hath a right to have anything done and hath no other specific means of compelling its performance."

Anciently it was issued for the delivery of public books, papers and records; to oblige bodies corporate to affix their seal ; for compelling the restoration of a party to a public office, etc.     The court of king's bench had a general supervision of the inferior courts and this writ grew out of the necessity of compelling the inferior courts to exercise those judicial and ministerial powers invested in them, by not only restraining their excesses but also in preventing their negligence and restraining their denial of justice.     The writ, however, never issued to restrain judicial discretion, except where greatly abused.     The usual use of the writ was to restrain inferior tribunals and keep them within their lawful bounds.

Blackstone further speaks of the office of the writ thus:

"This writ is grounded on a suggestion, by the oath of the party injured, of his own right and the denial of justice below; whereupon, in order more fully to satisfy the court that there is a probable ground for such interposition, a rule is made (except in some general cases, where the probable ground is manifest) directing the parties complained of to show cause why a writ of *mandamus* should not issue; and, if he shows no sufficient cause the writ itself is issued, at

first in the alternative, either to do thus or signify some reason to the contrary; to which a return or answer, must be made at a certain day. And, if the inferior judge or other person to whom the writ is directed returns or signifies any insufficient reason, then there issues in the second place a peremptory *mandamus*, to do the thing absolutely; to which no other return will be admitted, but, a certificate of perfect obedience and due execution of the writ. If the inferior judge or other person makes no return, or fails in his respect and obedience he is punishable for his contempt by attachment."

The Organic Act, page 44, § 9, Statute 1893, provides:

" The said supreme and district courts of said territory and the respective judges thereof, shall and may grant writs of *mandamus* and *habeas corpus* in all cases authorized by law."

Section 4595, Statutes 1893, reads:

"The writ of *mandamus* may be issued by the supreme court or the district court, or any justice or judge thereof, during term or at chambers, to any inferior tribunal, corporation, board or person, to compel the performance of any act which the law specially enjoins as a duty, resulting from an office, trust or station; but though it may require an inferior tribunal to exercise its judgment or proceed to the discharge of any of its functions, it cannot control judicial discretion."

Section 4596, id., reads:

" This writ may not be issued in any case where there is a plain and adequate remedy in the ordinary course of the law. It may be issued on the information of the party beneficially interested."

Section 4597, id., reads:

" The writ is either alternative or peremptory. The alternative writ must state, concisely, the facts, showing the obligation of the defendant to perform the act, and his omission to perform it, and command him that immediately upon the receipt of the writ, or at some other specified time, he do the act required to be performed or show cause before the court whence the writ issued at a specified time and place, why he

has not done so; and that he then and there return the writ with his certificate of having done as he is commanded. The peremptory writ must be in a similar form, except that the words requiring the defendant to show cause why he has not done as commanded, must be omitted."

Section 4598, id., reads:

"When the right to require the performance of the act is clear and it is apparent that no valid excuse can be given for not performing it, a peremptory *mandamus* may be allowed in the first instance; in all other cases the alternative writ must be first issued."

Section 4599, id., reads:

"The motion for the writ must be made upon affidavit and the court may require a notice of the application to be given to the adverse party, or may grant an order to show cause why it should not be allowed, or may grant the writ without notice."

Section 4600, id., reads:

"The allowance of the writ must be endorsed thereon signed by the judge of the court granting it, and the writ must be served personally upon the defendant; if the defendant, duly served, neglect to return the same, he shall be proceeded against as for contempt."

Section 4601 id., reads:

"On the return day of the alternative writ, or such further day as the court may allow, the party on whom the writ shall have been served may show cause, by answer made in the same manner as an answer to a petition in a civil action."

Section 4602, id., reads:

"If no answer be made, a peremptory *mandamus* must be allowed against the defendant; if answer be made, containing new matter, the same shall not, in any respect, conclude the plaintiff, who may, on the trial or other proceeding, avail himself of any valid objections as to its sufficiency, or may countervail it by proof, either in direct denial or by way of avoidance."

Section 4603, id., reads:

"No other pleading or written allegation is allowed

than the writ and answer; these are the pleadings in the case and have the same effect and are to be construed and may be amended in the same manner as pleadings in a civil action; and the issues thereby joined must be tried, and the further proceedings thereon had, in the same manner as in a civil action."

Section 3465, id., reads.

"Upon the death, resignation, suspension or removal from office of any officer, all books and papers belonging to his office, and all moneys in his hands and all property of whatever kind held by him by virtue of his office, shall be delivered to his successor."

Thus it will be seen from our statutory provisions that the office of the writ is not variant from its functions at common law, and that the plaintiff is entitled to seek the aid of the writ in this controversy.

In the case of *Ewing vs. Turner*, 35 Pac. Rep., 951, this court stated two well settled rules; the one that *mandamus* will not lie to try the title to a public office, and the other that *mandamus* will lie to compel a predecessor to deliver to his successor the books, records, muniments, insignia and official belongings appertaining to a public office, when the plaintiff shows in himself either an absolute or a *prima facie* title thereto, and that, as a general rule, where the plaintiff shows a certificate of election to an office, regular upon its face, or any lawful evidence of title later and superior to any other claimant, and that he had qualified, as required by law, that such would be deemed to be a *prima facie* title, and would entitle one holding the same to the official belongings of such office.

It is also held, that upon the application the court will not go behind the writ and try the title. The principles announced in that case are so well settled that it does not require an exhaustive review by the court of the list of authorities cited in support thereof. However, as the defendant has so vigorously assailed

the same doctrine in this case, and since two of the learned judges of this court dissented from that opinion, and as the legal questions affecting officers when seeking the aid of *mandamus* for the possession of the official belongings of a public office or admission thereto, is more squarely presented in this case, we think it our duty to make a thorough and exhaustive review of this question and forever settle, so far as this court is concerned, the law of such a case. The rule as laid down in *Ewing vs. Turner* is a substantial part of American jurisprudence, and its origin may be traced to the antiquity of the common law of England. It is not difficult to comprehend the necessity for the prompt and efficient remedy of *mandamus*. In an elective office the law requires that the evidence or credentials of the persons declared duly elected shall be a certificate of election, or in an appointive one, as in the case at bar, a commission from the governor. This is the highest evidence of title the law requires, and it is not for an individual to assert the invalidity of the law authorizing it, the want of authority for its issuance or the illegal exercise of the power conferring it. These are questions for the courts to determine, but in the meantime the person holding the commission or certificate of election, regular upon its face, evidencing an absolute or *prima facie* title to the office, is entitled to the possession of the books, records and official belongings thereto, notwithstanding the actual title may be in controversy at the time in the same or another tribunal. If this were not so, every elective or appointive office might be made the subject of a trial of title before the last person appointed or elected thereto could gain possession of it. The law would, in addition to its commission or certificate, require the person holding the same to go into court and show a better title, if possible, at the end of a suit in *quo warranto*, or a contest

in a tribunal constituted by law for the trial and determination of such cases. This would manifestly place it within the power of a person whose term of office had expired to defy the constituted authorities of a state or nation by an assumption or claim of title to an office when neither legally nor morally could he possibly have any right thereto, and when final judgment of a court was rendered against him, the party entitled to the office in virtue thereof would be, if refused, compelled to resort to *mandamus* to obtain possession thereof. A year or two years might elapse before a trial of the actual title could take place and the person holding the only evidence of title required by law for its possession, would be powerless to exercise and enjoy the office to which he had been elected by the suffrages of his fellow citizens, or appointed by a lawfully constituted executive authority. Such a law could only be regarded as a menace to good government, resulting in a seige of litigation, and abhorrent to all self-respecting aspirants to public office and to the finer sensibilities of the substantial citizenship of our country.

An individual has no more right to judge of a bad law than of a good one. One has no right to defy either a good law or a bad one, or no privilege to question or deny the authority of an officer to exercise an official function unless he do so in the manner prescribed by law. Revolt cannot be permitted against lawful authority when a successor has been named for an office to which title in another has ceased, either by a removal or by limitation of law, when possession is demanded in virtue of a title later and superior. Such person must surrender the office and if aggrieved seek relief or restoration in the proper tribunals of the country. We might conclude this point by saying that the proposition that *mandamus* will lie to compel delivery of records, muniments and official belongings

of a public office to a successor holding a *prima facie* or absolute title emanating from the authority constituted by law to convey it, after demand, has never been denied by any reputable authority in the history of English or American jurisprudence. We assert that in such a case the title to the office is not in controversy, nor can it be put in issue. Indeed it would be difficult to conceive a state of facts which could legally put the title in issue if it were conceded that the evidence of title were not fraudulently obtained. Certainly there are no such facts alleged in this case.

This brings us to a consideration of another branch of this proposition raised by the defendant, and that is, whether the defendant. by denying the authority of the governor to remove him under the law, can place in issue the title in a legal sense. We cannot regard this as a serious question. It is not competent to plead the law. The law is what the court is guided by in dealing with the facts, and the court will only inquire into the facts sufficiently to determine if the law has been observed. As a matter of course, the court must necessarily be governed by the law conferring upon the governor the power of removal. If the court should determine that the governor had unlawfully exercised his power of removal, or possessed no such power under the law, it could not hold that the plaintiff had, under the law, either an absolute or *prima facie* title; or, if the court should hold that the governor had no power or authority to appoint an officer without the advice and consent of the council, under the law it could not hold that the plaintiff had either an absolute or a *prima facie* title thereto, and the writ in consequence would have to be denied.

In this case, before the plaintiff could become possessed of title of any kind, sufficient to entitle him to the effects of the office, the law would have to concur in granting two things: First, the governor should

have the power of removal under the law; second, the governor should have the power to fill vacancies under the law without the advice and consent of the territorial council, and the power to give commissions as the law requires until the council should convene in regular session. If the governor possesses these powers, under the law, and the officer has qualified as required by law, the rule that he is *prima facie* entitled to the effects of the office to which he has been commissioned, applies, and the writ must be awarded. It is not a trial of the title to decide, as a matter of law, whether the plaintiff has made a sufficient *prima facie* showing to entitle him to the effects and official belongings appertaining to a public office.

The governor doubtless acted in the premises in virtue of the following several provisions of our organic and statutory law: Organic Act, § 2, stat. 1893, reads:

"The executive power of the Territory of Oklahoma shall be vested in a governor, who shall hold his office for four years, and until his successor shall be appointed and qualified, unless sooner removed by the president of the United States. The governor shall reside within said territory; shall be commander in chief of the militia thereof; he may grant pardons for offenses against the laws of said territory, and reprieves for offenses against the laws of the United States until the decision of the president can be made known thereon; he shall commission all officers who shall be appointed to office under the laws of said territory, and shall take care that the laws be faithfully executed."

Section 5877, Statutes of 1893, reads:

"Within ten days after the passage and approval of this act the governor shall appoint, by, and with the advice and consent of, the territorial council, a territorial superintendent of public instruction who shall hold his office for the term of two years, and until his successor is appointed and qualified."

Section 5878, id., reads:

"When a vacancy shall occur in the office of the territorial superintendent of public instruction, by death, resignation or otherwise, the governor shall appoint, as soon as practicable, some person to fill the vacancy, and the person receiving such appointment shall qualify as required by law before entering upon the discharge of the duties of the office, and shall hold his office until his successor is appointed and qualified."

Section 5934, id., reads:

"The superintendent of public instruction shall be ex-officio territorial auditor and perform the duties of that office."

Section 5973, id., reads:

"The supreme executive power of the territory shall be vested in the governor, appointed as provided by the laws of the United States, and he shall take care that the laws of the territory are faithfully executed."

Section 5974, id., reads:

The governor shall nominate, and by and with the advice and consent of the council, (expressed by a majority of all the councilors elected voting yeas and nays), appoint all territorial officers."

Section 5975, id., reads:

"In case a vacancy should occur in any territorial office, when the legislative assembly is not in session, the governor shall make a temporary appointment until the next session of the legislature, when he shall nominate some person to fill such office, and, if confirmed by the council, the person so nominated shall hold the office during the remainder of the term, and until his successor shall be appointed and qualified. Any person once rejected by the council, shall not be nominated for the same office."

Section 5976, id., reads:

"The governor shall have power to remove any officer so appointed by him, in case of incompetency, neglect of duty or malfeasance in office; and may then fill the same as provided in cases of vacancy."

Section 5989, id., reads:

"In addition to the powers herein conferred, and the duties imposed, the governor shall exercise such powers in relation to special subjects as provided by law."

These are the statutory provisions in this territory that bear directly upon the case at bar. Each has its particular application. From these, or that portion of them applicable, it must be determined if the governor of this territory unlawfully exercised his executive power in the removal of the defendant. The facts must be regarded in the application of the law. If the court believes, under the law, that the governor possesses the power of removal and appointment, then it is only necessary to determine if the evidence of title is regular and comes from the proper authority, *i. e.*, the governor in this case, and that the incumbent has qualified as required by law. When this is ascertained and everything appears regular and lawful, the writ must be granted as prayed for. A review of the authorities throughout the country may be useful to a full and comprehensive understanding of the legal questions involved in this case.

High, in his work on Extraordinary Legal Remedies, lays down the fundamental principles in *mandamus* on this branch of the subject as follows:

"The principles thus far discussed and illustrated as to the extent to which the courts will interfere by *mandamus* with questions of title to and possession of offices, and incidents relating thereto, have shown the extreme jealousy of the courts to lending their extraordinary aid in any case where its effect would be to determine disputed questions of title, all such questions being properly determinable by proceedings in *quo warranto*. It remains to consider such incidents connected with public offices as the books, records, seals, and other insignia of office, which, though intimately connected with the official position, do not form a necessary part of it. And it may be asserted,

as a general rule, that *mandamus* lies to compel the transfer or delivery of the books, seals, muniments, records, papers and other paraphernalia pertaining to a public office to the person properly entitled to their custody, and the writ may even be extended to the case of public buildings pertaining to an office, and may require the surrender of such buildings to the person legally entitled thereto.

"The branch of the jurisdiction under discussion is of ancient origin and was exercised by the king's bench at an early day, and wherever the term of an officer has expired, he may be compelled by *mandamus* to turn over to his successor all records and books pertaining to his office to which the public are entitled to access. And the writ may even be granted for this purpose in aid of the person declared duly elected to the office and holding the certificate of election, and duly sworn, although proceedings are pending to test the legality of his election, since the court by granting the writ does not finally determine upon the legality of the election. So the writ will go to the former mayor of a city, requiring him to deliver to the newly elected mayor the common seal of the municipality. And while it is true that *quo warranto* is the only method of determining disputed questions of title to public offices, yet a mere groundless assumption of an election on the part of the respondent, and a pretended exercise of the functions of the office *de facto*, will not deter the court from granting the *mandamus*.

"As regards the evidence of his title, which the relator must show who seeks the aid of *mandamus* to recover possession of official records and insignia, it is held that, having received a certificate of election and qualified in the manner provided by law, he is, *prima facie*, entitled to their possession and may enforce his rights by aid of the writ. And upon the application for *mandamus*, the court will not go behind the certificate of election and try the relator's actual title. It is, therefore, wholly immaterial whether the relator was eligible to the office in question, or whether he was duly elected thereto, since to try such issues would be to determine the title upon proceedings in *mandamus*, which the courts will never do. Otherwise, however, where the respondent has actu-

ally obtained judgment in his favor in proceedings to
test the election, and in such case the relator is not
entitled to the writ, even though he has appealed from
the judgment against him, and the appeal is still pend-
ing.

"The writ may be granted to compel the surrender of
public buildings to the officer properly entitled to their
custody as an incident to his office, where a former officer
refuses to surrender them.    In such case, the term of
the person in possession having expired, he is regarded
as in possession without any colorable right or title of
any nature, and is therefore a mere intruder, for
whose expulsion a prompt and efficient remedy is nec-
essary.    So, where the sheriff of a county is entitled
by law to the custody of the county jail, of which he
has been wrongfully deprived, he is entitled to the aid
of *mandamus* to restore him to possession.    And where
it is made by law the duty of the county clerk of a
particular county to provide for the transfer of certain
records to a new county created out of the old, the
writ will go to compel the performance of this duty."
(Secs. 73, 74, 75 and 76.)

Merrill on Mandamus, in discussing the same branch
of the subject as just quoted from High, says:

"A person who has the commission for or the proper
certificate of election to an office, has a *prima facie*
right to the office and he may resort to a *mandamus* to
enforce his rights in connection therewith.    Such evi-
dence of title can only be called in question in a direct
proceeding to determine the right to the office by *quo
warranto* or in a contest for the office.    When a person
has been duly elected or appointed to an office he may
use this remedy to obtain admission to such office
when admission has been refused by those having au-
thority in the matter.    It is a common practice to
grant the writ to the party holding the commission or
certificate therefor, to enable him to obtain the books,
papers or insignia of office, or the possession of prop-
erty or buildings properly in the custody of such
officer, or to enable him to enforce other rights grow-
ing out of his official position.    *    *    *    As indicated
in a prior section, the officer entitled to the books,
papers, records and insignia of office, and to the rooms
and buildings properly under his control, may obtain

such possession by the writ of *mandamus*, when they are improperly retained from him.   One who has been appointed or elected to an office may, by this writ, obtain all the muniments of his office from his predecessor.   *   *   *   Though there may be dispute as to the title to the office, even those courts which refuse to try the title to an office by the writ of *mandamus* will issue the writ in such cases in favor of the party who shows the *prima facie* title.   Such action will in no way prejudice or affect the contest for the office.   A party who has received a certificate of election or the commission of office and has qualified, is generally considered to have the *prima facie* title.   The relator in such case must show that he is an officer *de jure*.   Though the court may refuse to try the title to an office by the writ of *mandamus*, yet it will not regard a groundless assumption of the respondent's election to an office and a pretended exercise of the office *de facto*, but will compel the delivery of the seal, books, papers and instruments of the office to the party properly elected." (Secs. 142, 152 and 154).

Following the rule laid down by this eminent authority, the supreme court of South Dakota, in the case of *Driscoll vs. Jones*, decided March 1, 1890, and reported in N. W. Rep. 44, p. 726, sustains the doctrine.   The action was commenced in the circuit court of South Dakota by Robert H. Driscoll, who had been appointed clerk of the district court in and for Lawrence county, in the Territory of Dakota, to compel one Jones to deliver to the said Driscoll the seal, records and paraphernalia and other property of such office.   Before the commencement of such action, Driscoll notified Jones of his appointment and qualification as clerk of the district court, and demanded possession of the seal, records, etc., of the office, all of which Jones refused to surrender.   Driscoll then instituted the *mandamas* proceedings as stated.   The alternative writ was issued and afterwards by consent of the parties dismissed and the case was taken on appeal to the supreme court.   The court gave the sub-

ject much consideration, the following language being particularly pertinent to the issue in this case:

"Respondent contends that this is essentially a proceeding to try title to an office, and that *mandamus* cannot be used for such purpose. In theory, the line of demarkation separating the provinces of *mandamus* and *quo warranto*, and consequently the law governing each, respectively, is very well defined; but the practical difficulty often is to determine, from the features and characteristics of any particular case to which province it belongs, and consequently to which law it is a rightful subject. The law undoubtedly is, as stated by the learned counsel for the respondent, that title to office is not properly determinable in *mandamus* proceedings. If this proceeding involves primarily the title to this office, and a decision of this application for *mandamus* requires the investigation and determination of such a controversy, then, certainly, *mandamus* is not the proper remedy; and this must be the first question to be settled. The appellant invokes the aid of the law by *mandamus* for the accomplishment of the specific object, to-wit: the possession of the seal, records and other property incident to the office of clerk of the circuit court, and the mandate of the alternate writ simply responds to that appeal. Upon the trial in *mandamus* the plaintiff presents his credentials and the court then says, as a matter of law, these credentials do or do not entitle the holder to the possession of the property demanded. The court does not go behind the credentials to examine any antecedent questions of fact which might affect their force or credit. It takes the credentials at their face value, and if they come from the proper authority and are regular in form, the court declares their legal force and worth, not as evidence of plaintiff's title, or ultimate right to the office, but their legal value in support of his present claim—in this case the possession of the records of the clerk's office. These credentials may be subject to impeachment in *quo warranto* proceedings where all the antecedent facts may be investigated, and in such proceedings the court may say what ought to have been done, and give judgment accordingly; but in *mandamus* the court knows only what has been done, and, if the same is

legal and authoritative, on its face, further inquiry is
foreclosed. The question tendered by this applica-
tion for *mandamus* is not who is or may be finally enti-
tled to this office, upon investigation of all the prece-
dent facts of jurisdiction or regularity, but which of
these parties—the one holding the appointment of the
judge, supplemented by the provision of the state con-
stitution, hereinafter considered, and the other the
appointment of the board of county commissioners—
is presently, and pending such investigation, entitled
to the possession of the property pertaining to such
office. It may be that in this particular case a de-
cision of this question will render further investiga-
tion by *quo warranto* fruitless, but that could only be
so because everything is before the court on this rec-
ord that could be presented in *quo warranto*. It would
not justify the withdrawal of this case from the do-
minion of the general rule, but would rather demon-
strate, that, as a matter of fact, no hardship could
result to either party by a decision in this case. The
specific and only object sought by this appellant, and
the specific and only subject covered by the alterna-
tive writ in this case, being the immediate and pres-
ent possession of the seal, and other property pertain-
ing to the clerk's office, we hold that appellant was
entitled to proceed by *mandamus*, unless he had an-
other plain, speedy, and adequate remedy, in the
ordinary course of law. ( *Territory vs. Shearer*, 2 Dak.
332, 8 N. W. Rep. 135; *Crowell vs. Lambert*, 10 Minn.
369, Gil. 295; *State vs. Sherwood*, 15 Minn. 221, Gil. 172.

"The statute authorizes proceedings in the nature
of *quo warranto* to determine the title to office, and
this is the remedy which respondent claims should
have been resorted to in this case. So far as we have
succeeded in showing that this is not a proceeding to
try the title to this office, the objection to the use of
*mandamus* is removed; but, beyond this, an action in
the nature of proceedings in *quo warranto* would, in
our judgment, be neither speedy nor adequate. It
would not be speedy; for, in the ordinary course of
the law, a final determination of the rights of the
respective parties to this proceeding would not be
reached during the present term of office. (*State vs.
Sherwood*, 15 Minn. 229, Gil. 172). It would not be

adequate, for it would not accomplish the object sought. A judgment of ouster against respondent, and in favor of appellant, would not put him (appellant) in possession of the records of the office to which such judgment would establish his title. He might still be obliged to resort to *mandamus* to obtain such possession. (Section 5353, comp. laws; *Territory vs. Shearer*, 2 Dak. 346, 8 N. W. Rep. 135.) From these views it follows that, in our opinion, appellant has not mistaken his remedy, but is properly proceeding by *mandamus;* and we will now proceed to consider the case upon the merits."

The case of the *State of Minnesota ex rel. Atherton vs. Sherwood*, 15 Minn. 172, is a *mandamus* proceeding to require the delivery of the seal, books, papers, etc., belonging to the office of district clerk. An alternative writ was issued reciting that at the last general election, the relator, a citizen of the United States, of full age and residing in Austin, Moore county, was elected to the office of clerk of the district court of said county, and upon the official canvass, received a certificate of such election under the hand and official seal of the county auditor; that he gave the bond required by law and filed the same in the office of the register of deeds, and thereafter, at the office of the clerk of said district court, he demanded of the respondent, who was his predecessor, and whose term of office had expired, the seal, records, books, papers and all other things whatsoever belonging to said office, and then in respondent's possession, who refused to deliver the same to him. The writ required the respondent to deliver them to him or show cause to the contrary. A motion was filed by the respondent to squash the writ. The motion was overruled and answer filed and the issue of eligibility was raised. Chief Justice Repley, in delivering the opinion of the court, uses this language:

"What, then, remains on these pleadings which is material to be tried? As we are not to go behind the

certificate of election, we are only to determine whether or not the relator has received the certificate of election and has given the bond and taken the oath required by law. If so, he is *prima facie* the 'successor, elected and qualified', of the respondent, and as such entitled to the possession of the articles demanded, until, in a proper proceeding for that purpose, his title to the office shall have been tried and found defective.

"In other words, a *prima facie* title to the office gives a right to the possession of the insignia and furniture thereof, and the records and other books and papers appertaining thereto.

"But it is said that as *mandamus* will not lie to admit one to an office which is full, of one holding under color of right, but the claimant must resort to his proceeding in the nature of *quo warranto*, and as this office is thus full, this writ must be dismissed.

"But the reason of the rule is, that a *mandamus* to admit runs to others than the incumbent, and they are required to oust him, and thus his rights are sought to be passed upon in a proceeding to which he is not a party. But this is not the case. The respondent's title to hold till his successor is elected and qualified is not in question.

"If the view we have taken is correct, the relator, if he has a certificate and has qualified, is *prima facie* the clerk. He presents himself with all the evidence which the law has provided that he is the respondent's successor in office, elected and qualified. It is not for the latter to demand any other or further evidence before delivery of the insignia of the office, and the necessary means and implements for the exercise of its duties. If he may, why may he not also prescribe its character and decide on its sufficiency? While we have found no case in which the title to an office has been tried on a *mandamus* brought for similar analagous relief, the precise question raised here was raised and decided in the case of *People vs. Head*, 25 Ill., 325, cited in *Crowell vs. Lambert*, but even more entirely coincident in the question involved with this. The petition in that case recited that the relator held a certificate of his election as clerk of the county court of

McDonough county; that he had subsequently received his commission from the governor, and had qualified; that the former clerk, whose term of office had expired, was in possession of the records, furniture and key of the office, and refused to deliver them, and prayed a *mandamus* to compel their delivery to the relator.

"The answer alleged that respondent held his office by law till his successor was elected and qualified; that he was a candidate for re-election, and received a majority of the legal votes, and was actually contesting the election in the circuit court and that in the meantime he was entitled to possession, and prayed that the court would dismiss the writ, or make up an issue, whether relator or he were duly elected, and send it to be tried in the circuit court. The courts say that upon receiving the certificate of election, and taking the oath of office and giving bond, the relator was as much entitled to take possession of the office as he ever could be.

"Who, they ask, shall say, without law, that the party who possesses all the evidence of election and qualifications which he ever can have, all that the law has authorized to be given in any case, is not entitled to and shall not enjoy the office?

"This covers the whole ground, for if the respondent in that case had contested the right of the relator to the records on the ground that he was not eligible to the office, the above remarks would have been just as applicable. The case cannot be distinguished in principle from the one at bar, and a decision there reached seems to be well founded both in reason and authority."

*Warner*, respondent, *vs. Meyers*, appellant, 4 Oregon, 72, was a proceeding by petition in the circuit court praying for a writ of *mandamus* to compel Meyers to deliver to Warner the possession of the jail of the county, with its appurtenances and property therein belonging to the county. The petition alleges that Warner was duly elected sheriff, and that since his election he had qualified and entered upon the duties of said office. Meyers was acting sheriff of said

county, prior to the election and qualification of said petitioner. Meyers in his return to the writ alleges that he had received a majority of all the legal votes cast in said county for said office, and that a proceeding was then pending in court wherein he was contesting the right of respondent to hold said office. This portion of the return was striken out on motion as irrelevant matter, to which ruling of the court the appellant excepted. On the trial respondent produced in evidence his certificate of election issued to him and his oath of office endorsed thereon, his official undertaking with affidavits of justification of sureties, together with endorsements of approval and filing, and produced a certificate from the county clerk, showing that he had qualified as sheriff. The appellant then proved that he had been in possession of the county jail continuously during the year last past. The court in its opinion says:

"The only remedy pointed out by counsel for appellant is that provision of our statute which provides how the election of any person to any county or district office may be contested. (Mis. laws, ch. 14, §§ 41, 42.) Section 41 provides that any person wishing to contest the election of any person to any county or district office may give notice in writing to the person whose election he intends to contest, that his election will be contested, stating the cause of such contest briefly, within thirty days from the time said person shall claim to have been elected. The next section provides 'that such notice shall be served as a summons ten days before the hearing of said contest, and that if the circuit court cannot hear it in term time within one month of the termination of such election, the circuit judge may hear and determine it at chambers, as soon thereafter as may be practicable, and shall make all necessary orders for the trial of the case.' It further provides that 'the county clerk shall issue a certificate to the person declared to be duly elected by said court.' Here this proceeding ends. All the court can do in a proceeding of this nature is to determine who was duly elected and order a certificate

to be issued by the clerk to the person so declared duly elected. Respondent had no occasion to resort to this remedy, as he was already in the possession of a certificate of election, duly issued by the county clerk in pursuance of a decision of the board of canvassers whose duty it was, under the law, to canvass the votes and determine who had received a majority of all the legal votes cast. If he had resorted to this proceeding, all the court or judge could have awarded to him at the end of the proceedings would have been a certificate of election. With such a certificate in his possession, he could not have entered upon the duties of the office, until he had qualified by taking the oath of office, and filing his official undertaking.

This is precisely what he could have done, and in fact had done under the certificate which he already had at the commencement of this proceeding. But appellant, having been the former incumbent of the office, refused to recognize respondent as sheriff, and refused to deliver to him the county jail, with its appurtenances, and property therein belonging to the county to the possession of which the sheriff is entitled by virtue of his office. Thus it will be seen that the remedy pointed out by respondent is entirely inadequate to meet the emergency of this case. What appellant desires, is, to be placed in the actual possession of the county jail, and its appurtenances; and we know of no other plain and speedy remedy in the ordinary course of the law by which this object can be obtained.

"The statute concerning elections (Mis. laws, ch. 14, § 35,) 'makes it the duty of the county clerk, when the votes are canvassed, to make out a certificate of election, to each of the persons having the highest number of votes,' etc. By § 9, general laws, page 692, 'the sheriff must qualify by filing with the county clerk of the county wherein he is elected his certificate of election with an oath of office endorsed thereon, * * * and also give and file the undertaking hereinafter provided.' By § 983, civil code, 'when a new sheriff is elected or appointed and has qualified, the county clerk shall give him a certificate of that fact, under the seal of his office. Whenever thereafter the new sheriff is authorized by statute to enter upon the

duties of the office, he shall serve such certificate upon the former sheriff, from which time his powers cease, except when otherwise specially provided.' By § 984, 'within one day after the service of the certificate upon the former sheriff, he shall deliver to his successor the jail of the county, with its appurtenances, and the property of the county therein.''

"Under the provisions of the code thus cited above, and under the facts appearing in this record, it was the duty of appellant to deliver to respondent the county jail with its appurtenances and property therein belonging to the county."

*State ex rel. Meckling vs. Jaynes*, decided by the supreme court of Nebraska, and reported in 26 N. W. Rep. p. 711, was a case arising upon the application of Meckling, relator, for a peremptory writ of *mandamus* against Jaynes, respondent, commanding him to turn over and deliver to the relator the books, papers, etc., pertaining and belonging to the office of justice of the peace. The court, in discussing the proposition now under consideration, says:

"The relator's cause of action consists solely in his having been canvassed in, declared elected, awarded a certificate of election, taken the oath and given the bond required by law, and the respondent having refused or failed to deliver up to him the books, papers, and furniture of the office on demand. It was quite unnecessary for him to have alleged any other facts than these in his relation, nor would the denial and disproving of any other facts by the respondent defeat the action. It is stated as the law in a standard work on this branch of the law as follows: 'Upon the application for *mandamus* the court will not go behind the certificate of election and try the relator's actual title. It is therefore wholly immaterial whether the relator was eligible to the office in question, or whether he was duly elected thereto, since to try such issues would be to determine the title upon proceedings in *mandamus*, which the courts will never do.' (High Ex. Leg. Rem. pp. 74, 75), and this is the law of the country, generally. The remedy by contest, or that by *quo warranto*, are neither considered adequate, for

the reason that they are both directed to the title to the office itself, and in the nature of things usually consume considerable time, while the purpose of this proceeding is only for the present. A peremptory *mandamus* will therefore issue, as prayed."

*State ex rel. Simmons vs. John,* decided by the supreme court of Missouri and reported in 81 Mo. Rep., p. 13, was a proceeding by *mandamus* to compel respondent, who was mayor of the city of Lexington, to sign a warrant in favor of the relator, Simmons, drawn by Thomas B. Claggett, who was alleged to be register and treasurer of said city of Lexington. The respondent refused to sign said warrant, and alleged as reason therefor that Claggett was not the register and treasurer of said city; that one Turner had received a certificate of election from the city council and was commissioned by the mayor, who had qualified and provided his bond as required by law. Relator John admitted that Turner was commissioned and qualified, but averred that thereafter, and within the time provided by law, Claggett instituted proceedings to contest the election of Turner, and that said council declared the vote for said parties, who were the only candidates, to be a tie, and ordered a new election at which said Claggett was duly elected, and, having received a certificate thereof, was duly commissioned and qualified as register and treasurer as aforesaid. The respondent denied the jurisdiction of the council to determine a contest for the office of register and treasurer, and its authority to order the special election at which Claggett claims to have been elected. The court discussed the case as follows:

"It appears from the record that Turner and Claggett each claimed, at the time these proceedings were instituted, to be the rightful incumbent of the office in question, and each assumed to act as register and treasurer, and that no proceedings by *quo warranto* had been instituted by Claggett against Turner, and that Turner had possession of the records, seal,

money, books and papers of said city, and was performing some of the duties of his office, but that Claggett was recognized by a majority of the council as the rightful register and kept their minutes. It seems to be conceded that the respondent, as mayor, cannot lawfully sign the warrant in question, unless it has been drawn by the register. The mayor refuses to recognize Claggett as register, and the purpose of this proceeding is to compel him to do so. It is contended for the relator that no inquiry can be had, in this proceeding, into the right of Claggett to the office of register; and, that being a *de facto* officer, the mayor is bound to recognize his official acts. With the ultimate right of either Turner or Claggett to the office of register, we can have nothing to do in this proceeding. The right to an office cannot be determined in a proceeding by·*mandamus* to compel the payment of salary to a person claiming such office, or in a proceeding, like the present, to compel the performance of official duty alleged to be obligatory by reason of the official character of such claimant. In such cases he who has the better *prima facie* right must be recognized, until, by contesting the election, or by proceedings in *quo warranto*, the rights of the parties are finally determined. Under this view of the law, which is supported by the decision of this court in the case of *State ex rel. Vail vs. Draper*, 48 Mo. 213, it is quite plain, on the facts in this record, that if Turner had instituted a proceeding by *mandamus* to compel the payment of his salary as register, he would have been entitled to a peremptory writ. The votes for Turner and Claggett were duly canvassed. Turner received the certificate, was duly commissioned and qualified."

In the case of *State vs. Johnson*, decided by the supreme court of Florida and reported in 11 So. Rep. 845, the court holds:

"In *Thompson vs. Holt*, 52 Ala. 491, Thompson, the appellant, had been duly elected judge of probate for six years; and having duly qualified by taking the oath and giving bond, and having received a commission from the governor, he entered upon the duties of the office. The law required that judges of pro-

bate should give an additional bond whenever the grand jury, in term time, or, in vacation, three members of the commissioner's court, should, by address to the circuit judge, require it; and it made the failure to execute such additional bond a forfeiture or vacation of the office. It also imposed on the circuit judge the duty of certifying the vacancy to the governor, who was required to fill it. Thompson having, during his term of office, been required, in the manner stated, to give an additional bond, and the circuit judge having, upon investigation, refused to approve a bond, in due form, tendered by Thompson, the judge certified the fact of the vacancy to the governor, who appointed Holt to fill the vacancy. Holt, having qualified and been commissioned by the governor to the vacancy, demanded the books and other property of the office, but Thompson refused to deliver, whereupon Holt instituted a statutory remedy given to compel delivery in such cases. The opinion of the supreme court of the state, delivered by Brickell, C. J., holds that the giving of the additional bond was a condition upon which the continuance in the offiice depended, and that statutory proceedings to compel the transfer of books and other property of a public office, though more summary and less formal, was merely cumulative, and would lie wherever *mandamus* could be obtained at common law. 'A *mandamus*,' says the learned judge, 'to compel the delivery of property, could not be invoked when in reality the object was to test the title to the office. If the title was the real question in issue, the courts could not interfere by *mandamus*, but remitted the the parties to *quo warranto* or other appropriate legal remedy. The relator must have exhibited a clear *prima facie* title entitling him to the custody of the property of the office or the courts would not compel its transfer to him. The same rule must prevail with reference to the statutory proceeding. It cannot be perverted into a method of determining the strength of rival claims to a public office. The complainant resorting to it must show a *prima facie* title to the office, free from all reasonable doubt, a title to which the law attaches the possession of the property of the office, and the right to exercise the functions of the office, until, in a direct judicial pro-

ceeding, that title has been vacated. A *prima facie* title to a public office confers a right to exercise its functions, and a right to the possession of the insignia and property thereof. On this *prima facie* title the court will compel a delivery of the insignia and property that the functions and duties of the office may be exercised.' It was also held that the action of the circuit judge in refusing to approve the addional bond could not be inquired into collaterally, or on the special proceeding to deliver the official property, and the order made on the special proceeding for the delivery of the property was affirmed. 'Public officers,' says the opinion, 'are elective and returns of elections are made to the secretary of state, on whose certificate the commission originally issues. When, subsequently to an election, a vacancy occurs otherwise than by resignation, some public officer, ministerial or judicial, acting under the sanction of official oath, is charged with the duty of ascertaining and certifying the fact of vacancy to the governor. On this certificate an appointment is made, when it discloses that the office is vacant. The commission of the governor, whether granted on the certificate of election or certificate of vacancy, is the highest and best evidence of who is the officer, until in a *quo warranto*, or a proceeding in the nature of a *quo warranto*, it is annulled by a judicial determination. It is this commission which imparts to the courts judicial notice, and which informs the community, who are clothed with official authority and bound to official duty. In a proceeding, whether by *mandamus* or under the statute to compel the transfer of property attached to a public office, this commission is a clear *prima facie* title to the office, on which the courts will proceed without indulging any inquiries behind it, when it is founded on a certificate of election or a certificate disclosing vacancy, made by proper authority. Inquiries behind it would generate a controversy as to title to the office, which, as we have already said, cannot be entertained either on an application for a *mandamus* or in the statutory proceeding. The court must rest on the *prima facie* title, and award the keeping of the property of the office to this title, for the time being, without adjudicating whether the relator has or has not the actual title.'   *   *   *

"In the case at bar there is a clear *prima facie* title, free from all reasonable doubt, in Gillen, and there has been not even an irregularity in the exercise of the exclusive executive power of suspension and appointment, and the power to suspend is unquestionable. When the power has been executed in due form, it is the duty of the suspended officer to cease to exercise the duties of his office, and it is likewise his duty to turn over the books to the appointee commissioned by the governor to perform the duties of the office. If it is not done voluntarily, and there is no remedy to compel it, then nothing but confusion in government will follow. It is a mistake to suppose that *mandamus* is excluded or avoided by the mere fact that there is another remedy. The law is that there must be another specific and adequate remedy. (*Ray vs. Wilson*, 29 Fla. 342, 10 Southern Rep. 613; Tapp Mand. 18, 19; High Ex. Rem. §§ 9, 15, 17; *Baker vs. Johnson*, 41 Me. 15; *People vs. Stevens, supra*; *Harwood vs. Marshall*, 6 Md. 83.) *Mandamus* is clearly the only adequate remedy for preventing the confusion alluded to and particularly as the senate and not the courts is the body to pass upon the correctness of the action of the executive so long as he keeps within the range of the power confided to him."

In the case of *Huffman vs. Mills*, 39 Kan., 577, it is held :

" Where one receives a certificate of election to the office of sheriff from the acting county clerk, after a canvass of the election returns by the acting board of county commissioners, and qualifies by filing his oath and bond with said clerk, said bond being approved by said board, he is entitled to a *mandamus* to compel the former sheriff to deliver property belonging to the sheriff's office."

The case of the *People ex rel. John B. Cummings vs. William T. Head*, 25 Ill., 287, was an original proceeding in *mandamus* instituted against Head. The facts were, that the relator was elected to the office of clerk of the circuit court and received a certificate of such election; that he was duly commissioned as such officer by the governor of the state; that he took the neces-

sary oath of office, gave bond and qualified in all respects as required by law. His opponent in the election was the respondent, William T. Head, and the former circuit clerk, in whose possession were the files, books, papers and records belonging thereto. That the relator, on numerous days before the filing of his petition, demanded possession of the office and of the books, papers, files and records, furniture, key, etc., of said Head, but that his demands were refused. The relator prayed that the writ of *mandamus* issue requiring Head to appear on some day to be named therein, and show cause, if any he had, why a peremptory writ of *mandamus* should not be awarded against him as prayed for. The court considers the question thus:

"Two questions are presented by this record. The first is, was the relator entitled to enjoy the office of circuit clerk during the pendency of the contest of the election? and, second, if so, had he any other clear and adequate remedy? In this case, it is true, the contestant is the old clerk, and in possession of the office, but such is not always the case. Suppose the old clerk had not been a candidate. Could he, when the relator presented himself with a certificate of election, having taken the oath of office, and given the requisite bond, and demanded the records, etc., say to him that somebody, who had been a candidate, was going to contest the election, and would, within thirty days allowed by law, give him notice of a contest, or had already given such notice, and upon the mere suggestion that the demandant had not been legally elected, hold on to the office himself by force? He would have the same legal right to do it in that case as in this. If the course pursued in this case by the old clerk should be sustained, then every one elected to an office, no matter how fairly or legally, may be kept out of it during a contest, which, by appeals and delays, may continue during a considerable portion of the time, if not the whole period for which he was elected. Such is not the law, as we understand it.

"The writ of *mandamus* is not a writ of right in all

cases, but is rather to be considered as the last refuge
—the dernier resort, when the law affords no other sure
and adequate remedy. Nor is it the proper writ by
which to try and finally determine the right of either
party to the office. Whatever our decision may be, it
cannot affect, in the least, the contest now going on
in the legal tribunals. We can only determine whether
the relator is entitled to the records, etc., pertaining
to the office. It is true this involves, incidentally, the
inquiry as to who is entitled to enjoy the office for the
time being, but we by no means settle the question
whether the relator was legally elected or not."

The supreme court of the United States, *In re. Delgado*, 140 U. S. 586, in substance, announce this doctrine. That was a case originally from the district
court of the Territory of New Mexico. The appellant was the clerk of the board of the county commissioners, but refused to recognize the board that had
just been elected and qualified, as required by law,
and in possession. The board of commissioners
sought the aid of the writ of *mandamus* to compel recognition. An alternative writ was issued by the district court granting the prayer of the petition. In
obedience to the writ appellant appeared and filed an
answer alleging that three other persons had been
elected county commissioners, and that the petitioners were not. He admitted that he refused to recognize the petitioners as the board of county commissioners, and alleged that they were not the legally
elected commissioners, and had never been in possession of such offices. A peremptory writ of *mandamus*
was then awarded. Appellant refused to obey the
writ, and he was brought before the district court and
punished for contempt. He appealed to the supreme
court of the territory, where the judgment of the
lower court was affirmed. He then appealed to the
supreme court of the United States. Justice Brewer,
in speaking for the court, says:

"In case of a disputed election to a municipal office,

*mandamus* may issue to compel the recognition of the *de facto* officer until the rights of the parties can be determined on *quo warranto.* * * * Does the fact that certain parties are contesting their right as commissioners oust the court of jurisdiction, or forbid it to compel other county officers to recognize them? Must the office of county commissioner remain practically vacant, and the affairs of the county unadministered, pending a trial of a right of office betwen contestants? Surely not, public interests forbid. They require that the office should be filled; and that when filled by parties under color of right, all other officers should recognize them as commissioners until their right to hold the office has been judicially determined adversely by proper *quo warranto* proceedings."

That *madamus* is the proper remedy where a party seeks to recover the books, seal, records, insignia, etc., of a public office admits of no doubt. (See *Warner vs. Meyer*, 4 Or. 72; *People vs. Kilduff*, 15 Ill., 500; *State vs. Jaynes*, 26 N. W. Rep. 711, 55 Tex. 390; *Lindsey vs. Luckett*, 20 Tex. 516; *State ex rel. vs. John*, 81 Mo. 13; *Keenan vs. Perry*, 24 Tex. 253; Merrill on Mandamus §§ 142, 152 and 154; *Keokuk vs. Merriam*, 44 Iowa 432; *Huffman vs. Mills*, 39 Kas. 577; *People vs. Kilduff*, 15 Ills. 492; 4 Tex. 400; High Ex. Leg. Rem. §§ 73, 74, 75 and 76; *State vs. Peterson*, 52 N. W. 655; *Walter vs. Belding*, 24 Vt. 658; 3 Black 110; 12 Am. Dec. 28; *Brown vr. Turner*, 70 N. C. 93; *People ex rel. vs. Head*, 25 Ills. 287; 5 Johns 128; 6 Hill 114; 49 Barb. 116; *Driscol vs. Jones*, 44 N. W. Rep. 726).

If the governor has not the power to hear and determine the charges against an officer, it is upon the theory that such hearing involves a judicial investigation and consequently belongs to the judicial branch of our government. There are some authorities that hold such a hearing to be judicial, but these authorities all proceed upon the theory that the relator has some property in the office; that it is a hereditament. This was true under the old common law of England

when the courts considered that the possessors of an office had a property right in it that could be inherited. But in this country nothing is more foreign to our law, or repulsive to our sense of free government, than the idea that an office is created for some person's particular benefit, or that anyone should have a property right in it.    Offices are created for the carrying on of the various departments of our government.    No one has a right of property in an office such as would bar the executive from removing him, if cause presented, where the statute confers that power, or even without a statute, an executive officer may exercise the power of removal, unless expressly prohibited, for the power of appointment, under the law, carries with it the power to remove.

There is no contract between the government and the officeholder.    He is a mere agent in the office for the public good, not for his own, and if such officer is guilty of malfeasance or maladministration in office it is within the power of the appointing power to remove him, unless expressly prohibited by law, as stated. This power has been continually exercised of late years by the presidents of this republic without statutory provisions, and it would indeed be an anomalous condition if a governor, whose power of appointment and removal is conferred by express legislative enactments, could not act legally in pursuance of such power.

Throop on Public Officers discusses the question of property in office thus: ·

''But in this country no public office can properly be termed a hereditament, or a thing capable of being inherited.    Here public offices are not the subject of grant or delivery.    'An appointment to an office is only the execution of a power given by statute, and does not operate in any sense as a transfer of property or franchise from the person who makes the appointment to him who receives it.'    'All public offices

emanate from the people and are governed by the constitutions and the laws.'

"It is, therefore, well settled in the United States, that an office is not regarded as held under a grant or a contract, within the general constitutional provision protecting contracts; but, unless the constitution otherwise expressly provides, the legislature has power to increase or vary the duties, or diminish the salary or other compensation appurtenant to the office, or abolish any of its rights or privileges, before the end of the term, or to alter or abridge the terms or abolish the office itself.

"As we have shown in the previous chapter, in this country an office is not regarded as property, nor has the officer any vested rights therein, which are within the protection of the United States constitution, or the general provisions of a state constitution, forbidding legislative interference with property or vested rights. It follows that the power of the legislature, in this respect, is practically unlimited, except where it is limited by provisions of the constitution, having express or implied reference to this particular subject." (Secs. 17, 19, 345.)

In *State vs. Hawkins, supra,* the court, after citing the cases holding that an incumbent had a property right in a public office, says:

"But these decisions have, as a rule, proceeded upon the ground, that an incumbent has a property in his office and that he cannot be deprived of his right without the judgment of a court. This view finds support in the doctrines of the common law, which regarded an office as a hereditament, but has no foundation whatever in a representative government like our own."

The following authorities sustain the doctrine here announced : *State vs. Hawkins,* 44 Ohio St., 98; *Terry of Dak. vs. Cox,* 6 Dak. 501; 8 Ind. 302; Throop on Public Officers, *supra; Donohue vs. Will,* 100 Ill. 99; *Taft vs. Adams,* 3 Gray 126; *Ex parte Wiley* 54 Ala. 226; *Thompson vs. Holt,* 52 Ala. 491; *State vs. Frazier,* 48 Ga. 137; *Patton vs. Vaughan,* 39 Ark. 211; *Connor vs. Mayor of New York,*

1 Selden 285; *Long vs. Mayor*, 81 N. Y. 425; *People vs. Whitlock*, 92 N. Y. 193.

We next advert to the question whether the governor had the right to hear and determine the evidence against an official, pass upon it and remove him from office, where the statute of the territory confers the power of removal upon him.   The authorities are uniform in holding that this is not a judicial power exercised by the governor.   The case of the *Territory of Dakota ex rel. vs. Cox, et al.*, 6 Dak. 501, was an action in the nature of *quo warranto* brought on information of the district attorney to oust Robert Cox, Miles T. Wooley, W. T. Quigley and F. A. Gale, from the office of trustees of the insane asylum located at Yankton, Dakota.   The questions of law raised were that there was no power in the governor to remove the trustees, and that if he had power to remove them he had no power to appoint the defendants without the advice and consent of the council.   On the proposition that the governor had no power to remove the trustees the argument was used that under the organic law the power of removal is judicial and not executive and that the legislature could not authorize the governor to exercise such power.   Chief Justice Tripp rendered a very able and exhaustive opinion, which was subsequently reported.   (See 6 Dak. 501.)   We quote from the opinion:

"What then is judicial power?   It is said to be 'the power to hear and determine,' but this definition is too comprehensive; every administrative and executive officer is required to hear and determine many facts upon which his action is based.   All the political and executive departments of the government are required to pass upon controverted questions of fact; boards of canvassers, boards of equalization, boards of county commissioners and other administrative officers are continually passing upon questions of the greatest moment to the citizens, involving the right of office, the disbursment of the public revenue in the erection

of bridges and public buildings, and the opening of highways, in fixing the values of property and in the levying and collecting of taxes, often involving civil rights and sometimes, where the administration of the government is concerned, rights of persons and property; and while the determination of such questions involves judgment and discretion, and the examination of difficult and controverted questions of fact, and while the decision of such administrative officer upon such hearings is final, yet his action is not judicial. * * * Such action by administrative or executive officers is not judicial in the sense that it belongs exclusively to the courts. It may be so far judicial that such an officer so exercising judgment and discretion in the determination of controverted questions of fact, may be protected in an erroneous determination of the matter before him, but not so far judicial that the subject matter is cognizable by the courts only. All judicial power, by the Organic Act, like the constitutions of the states and of the nation, is vested in the courts; a prohibition upon its exercise by the executive or legislative department; but the judicial power therein conferred upon and limited to the courts, is that judicial power which in the legal acceptation of the words can be exercised only by the court. It is the power which is confined to the courts by the words of limitation in the constitution itself, 'that no person shall be deprived of life, liberty, or property, without due process of law.' (Art. 5, Amend. to the Const.) In other words, the courts have exclusive power to hear and determine those matters which affect the life or liberty or the property of the citizen; all other rights, while they may be in a sense judicial, are not so far within the jurisdiction of the courts that their exercise by another department would be void.

"Is the right in controversy of that character? Does it affect the life, the liberty or the property of the citizen? Judged by this test, it is not a judicial power. It is a power often conferred upon the courts, and its exercise is highly judicial in its character; it often involves close and contested questions of fact, and nice and delicate discriminations in the application of law, but it is the subject matter, and not the

procedure that determines jurisdiction. I have examined the cases with much care which have been collected and presented to me with commendable zeal and industry, and an examination of the cases here cited, without an attempt at review, discloses two distinct lines of authority, holding opposite and contradictory views upon the question we are discussing; though many of the cases may be distinguished as being based upon the peculiar phraseology of the provisions of the constitution construed. The authorities holding that removal from office is a judicial power and can be exercised only by the courts, are based upon the theory that an office is in the nature of a property right and that the citizen can be deprived of it only by 'due process of law,' while the other line of decisions hold that under our form of government, there is no property in an office, that offices and officers are for the benefit of the people and not for the benefit of the officers, and that whenever the officer fails to perform the duties of the office, the office becomes forfeited and that the only object of the examination necessary to determine such forfeiture is such as will establish the fact, not to the satisfaction of, or for the benefit of, the incumbent, but to the satisfaction of the executive department which is charged with the execution of the laws, and that hence the removal may be summary, or upon such an investigation as may be prescribed by the legislative department.

"Without stopping to notice further the learned arguments and reasonings of the courts, I am content to say that, in my judgment, those decisions which hold the power of removal to be executive in its nature, are more in harmony with our age and our form of government. The right of removal always existed unquestioned in the king, even after the encroachments of parliament; and while in adopting the common law of England we did not adopt the form of government to which it applied, yet in defining the words 'judicial, legislative and executive,' which are found in our written and common law, we may safely have recourse to the source from which they are derived to aid us in determining their present meaning. And if the officer may be removed by the

executive, he may be removed either with or without notice and hearing, as the legislature have chosen to provide or as the terms of the constitution may require. Our organic law is silent upon this subject, and it follows that if power of removal in this case is given to the governor, with no notice or hearing provided, he would be at liberty to remove summarily upon the occurrence of such an event, as may be prescribed by statute."

The case of *Donahue vs. The County of Wills et al.*, 100 Ill., 94, was a case in which the appellant was elected treasurer of Wills county, gave the requisite bonds, qualified, and was commissioned and acting as such in the performance of the duties of the office. At the September meeting of the board of supervisors a committee was appointed to settle with him and the sheriff. On investigation, and, as they reported, on fair and careful settlement of the appellant's accounts, he was found to be in arrears to the county for a considerable sum and was removed from his said office. The appellant appeared before the board and was heard, but failed to satisfy that body that there was any error or mistake in the report or findings which they had made. Appellant thereafter filed a petition for a writ of *certiorari* to the circuit court, and hearing was had on the return as though a demurrer had been filed to it, and the court quashed the writ and held the return sufficient and rendered judgment against the petitioner, and appeal was thereupon taken to the supreme court. Appellant urged that the evidence before the board of supervisors was insufficient to authorize his removal. The court, in a very able and exhaustive opinion, treats the subject as follows:

"The question is then presented whether the board of supervisors had legal authority and constitutional power to hear, determine, and remove appellant from office. He claims it had not, because that could be done only by impeachment, or, if not in that mode

then only by trial by the circuit court, on a proceding in the nature of a *quo warranto.*

" It is urged that under the constitution the general assembly is powerless to pass a law conferring such power on the board of supervisors, and for that reason the order of the board is absolutely void.    This depends upon whether any constitutional provisions prohibits that body from the exercise of such power. There is no provision of that instrument which in terms prohibits it, or provides for the removal of such officers for nonfeasance, misfeasance or malfeasance in office.    *    *    *

"We are referred to the second section of the bill of rights, which declares that 'no person shall be deprived of life, liberty or property, without due process of law', as controlling this question; that under this provision appellant could only be deprived of his title to or property in the office by a trial and judgment in a court of law; that no other trial, before any other tribunal, would be by due process of law, and that the general assembly had no constitutional power to provide any other mode of trial.    It is impossible to conceive how, under our form of government a person can own or have a title to a governmental office. Offices are created for the administration of public affairs.    When a person is inducted into an office, he thereby becomes empowered to exercise its powers and perform its duties, not for his, but for the public benefit.    It would be a misnomer and a perversion of terms to say that an incumbent owned an office, or had any title to it.

"The doctrine on this subject is thus stated in the case of *Conner vs. The Mayor of New York*, 1 Selden, 285.    It was there said :    'Public offices in this state are not incorporeal hereditaments nor have they the character or quality of grants.    They are agencies. With few exceptions, they are voluntarily taken, and may at any time be resigned.    They are created for the benefit of the public, and not granted for the benefit of the incumbent.    Their terms are fixed with a view to utility and convenience, and not for the purpose of granting emoluments during that period to the office holder. * * *.    The prospective salary or

other emoluments of a public office are not property of the officer, nor the property of the state. They are not property at all. They are like daily wages unearned, and which may never be earned. The incumbent may die, or resign, and his place be filled, and the wages be earned by another. The right to the compensation grows out of the rendition of services, and not out of any contract between the government and the officer, that the services shall be rendered by him.'

'' This is correct in the sense that the officer does not own the title to the office in the manner that men own property; but by his commission or induction into office he acquires the legal right to exercise its functions, and to receive the emoluments that he earns, until the end of his term, or until his resignation, removal or its forfeiture. * * *.

''Knowing, as they did, that the general assembly had all legislative power—unless limited in its exercise—if that body intended that a person, not a state officer, or holding under the judiciary article, should not be removed, except by the judgment of a court, they would have so provided. They knew that a proceeding by *quo warranto*, with the right to appeal, would be useless where the term fixed is of short duration, as it would expire before a final decision could be reached. The body, as practical men, could not have intended that such slow processes should be adopted, and thus permit a reckless, dishonest and irresponsible officer to collect and defiantly squander the public revenue, compel his bondsmen to stand by and see him working their financial ruin, and neither the public nor the individuals be able to check it, but to wait till his office expires before he is removed or checked in his destructive course. We must presume the framers of the constitution intended to place no limitation on the power of the general assembly to provide ample and effective means to prevent such wrongs to the public and to individuals. Possessing legislative power, the general assembly was fully competent to prescribe the offenses which should work a forfeiture of this office, and provide what tribunal shall determine the fact. They have provided that defalcation in office shall be grounds for removal of a

county treasurer and that the county board should have power to determine the fact and make the removal, and we are clearly of the opinion that there is no limitation which forbids the general assembly from exercising the power.

"As to the question whether an officer can be removed from office for misfeasance or malfeasance without a judicial sentence there would seem to be little doubt. It has been held they may, by many respectable courts.    *    *    *

"It is said that the finding of the fact that an officer is a defaulter, and removing him from office, is the exercise of judicial power, and the third article of the constitution prohibits the exercise of such power by any person other than an officer of the judicial department; and the board of supervisors belong to the executive and not to the judicial department. It is, therefore, insisted that the action of the board is forbidden and is consequently void. It may, in many cases, be a matter of difficulty to determine the precise line which divides the executive functions. It has been said that where the functionary hears, considers and determines, then he performs judicial acts. This definition is not strictly accurate. Take, for instance, an election board. It examines the ballots, counts, determines and certifies the result. The county clerk, and the persons he called to his assistance, examined the returns from the various towns, ascertained the result, declared and certified that appellant was elected, and on that certificate he was commissioned, and yet no one supposes they exercised judicial functions. They, however, heard, considered and determined, as much as did the board in auditing appellant's accounts and ascertaining he was in default. Had he died, they would have heard, considered and decided. So, had he removed from the county. Had he failed to file his bond and oath, the board would have been required to hear, consider and determine, and so, had he become insane, and yet no one would be inclined to say there was the exercise of judicial functions in each of these cases; and yet the action would, in a degree, have been the same. There is in every ministerial or executive act a necessity for the hearing of evidence, a consideration of the evidence, and a determination based

on it. When the governor determines to call out the militia to suppress an insurrection, it is upon evidence of the existence of the fact, the consideration of the question of whether the emergency exists requiring him to act, and upon that evidence he decides the question—and this, too, although the emergency is asserted on one side and denied on the other, and the evidence may be contradictory. So, it is seen, the definition is by no means accurate. It embraces cases that are not judicial, and hence is too comprehensive. From the cases we have referred to it will be seen that such a removal as this was not regarded as judicial in its nature, and such acts were held valid notwithstanding they were performed by a single executive officer, or by an executive body.

"We are therefore of opinion that the settling of this treasurer's accounts, and finding he had not settled and accounted for moneys of the county as required by law, and that he had been, and then was, in arrears with the county, and removing him from office was not judicial. And we have no doubt the general assembly had ample power to authorize the board to act, and it is legal and valid."

*State ex rel. Attorney General vs. Johnson,* decided by the supreme court, of Florida, and reported in 11 So. Rep. p. 845, was a proceeding in *mandamus* by the state against James E. Johnson to compel him to deliver to Edmond W. Gillen, as tax collector for Duval county, the office of county tax collector, of said county, and all the property, books, papers, etc., belonging to or appertaining to said office. Defendant moved to quash the proceedings, which motion was overruled, and the said Johnson was by the governor of the state of Florida removed from said office, and Edmund W. Gillen appointed as his successor. That court discusses the question thus:

"There are two contentions on behalf of respondent which will be disposed of primarily. The first is that the power of suspension given to the governor cannot be exercised by him until there has been an ascertain-

ment 'by the judgment of the courts or some other tri-
bunal possessed of judicial power,' of the existence of
one or more of the causes for which suspension is au-
thorized by the designated section.  The power to
make the inquiry and decide upon the existence of
that which is 'within the legal quality ·of wrong'
for which suspension may be inflicted is claimed to be
judicial in its nature, and not within the official
attributes of the governor.  Our judgment is that,
whether the power be strictly judicial, or, on the con-
trary, administrative in its character, it exists in the
governor.  Moreover, it is indisputable that if there is
an adjudication anywhere, which, under constitutional
provisions professing, like ours, to give the power of
suspension or removal to the governor, or other
executive, or administrative functionary, holds that
such functionary has not the power to enquire into
and decide upon the existence of the cause of removal,
it has not been presented by counsel, nor has one been
found by us in our own researches.

"The last observation and the importance of the
principle involved necessitate a presentation of the
authorities relied upon by counsel for respondent.
We will consider them in the order in which they
appear in the brief.  The decision in State vs. Pritchard,
36 N. J. Law, 101-119, ( cited as Police Com'rs of Jersey
City, 36 N. J. Law, 112-113) is as summarized in the head-
notes, (1), that the right to remove a state officer for
misbehavior does not appertain to the executive office;
that such act is judicial and belongs to the court of
impeachment; (2), certain police commissioners of
Jersey City, appointed by statute, having been con-
victed upon indictment of conspiracy to cheat the
city, and the governor having declared their offices to
be thereby vacated, and having appointed their suc-
cessors, it was held that the executive action was
illegal and void.  The opinion clearly shows that no
provision of the constitution, nor of any statute pro-
fessed to give the governor the power of removal or
suspension, and that the law did not give the conviction
the effect of forfeiting the office, but that under the
constitution, the jurisdiction to vacate the office was
in the court of impeachment in which the constitution
invested a part of the judicial power of the state, the

senate having the power of trial, and the assembly the right to impeach. Another case cited is that of *Dullam vs. Wilson*, 53 Mich. 392, 19 N. W. Rep,, 112, (decided in the year 1884,) where the removal was for 'official misconduct and habitual neglect of duty.' By an amendment made in 1862 to the Michigan constitution, it was ordered: 'The governor shall have power, and it shall be his duty, except at such times as the legislature may be in session, to examine into the condition and administration of any public office, and the acts of any public officer, elective or appointive, to remove from office, for gross neglect of duty, or for corrupt conduct in office, or any other misfeasance or malfeasance, either of the following state officers, to-wit, the attorney general *. * * or any other officer of the state, except legislative and judicial, elective or appointed, and to appoint a successor for the remainder of their respective unexpired term of office, and to report the cause of such removal to the legislature at its next session.' The opinion delivered by Judge Champlin holds unequivocally that the power of removal can be exercised only for the specific causes mentioned in the amendment and upon specific charges of the particular acts relied on to make out the causes and upon reasonable notice and opportunity for a hearing, and that the governor has judicial power to examine into and pass upon the charges. He says : 'It is only when the causes named exist that the power conferred can be exercised. It follows, as a necessary consequence that the fact must be determined before the removal can be made. * * * And the first question is what is the proper tribunal in which such facts are to be ascertained ? In my opinion this provision of the constitution requires no legislation to make it effective. Read in the light of the history of the times, and the surrounding circumstances, when it was adopted, the grant of power is to the governor, coupled with the duty enjoined to examine into the acts of any public officer and to remove from office, for gross neglect of duty or for corrupt conduct in office, any of the officers specified. The amendment for this purpose clothes him with judicial power. It is implied in the grant, and without it the grant would be nuga-

tory and ineffectual to accomplish the purpose for which it was given.' Again, he says that the amendment, in effect, gives the governor 'the right to try the question whether the officer is guilty or not and to remove him from office.' There is in the opinion nothing inconsistent with these views. At the foot of it we find the following: 'Sherwood, J., concurred.' Cooley, C. J.: 'I concur both as to the right of the respondent to be heard upon charges, and as to the power of the governor, under the constitution, to decide upon the charges.' Then follows the opinion of the fourth judge, Campbell, and he alone asserts the view that any court proceeding was necessary; and whereas, he concurs with the other judges in the judgment for the respondent, on the ground that respondent had no notice or opportunity for a hearing, still his views affirming the necessity for a proceeding in court are entirely antagonistic to these as to the sole power of the governor to determine the existence of the cause for removal asserted by the court through a majority of its judges and for which an adjudication is an authority. Of the other cases relied on in this connection (*Page vs. Hardin*, 8 B. Mon. 648), it is only necessary to say that, like the one from New Jersey, *supra*, there was no pretence of grant of power of removal or suspension to the executive; and, considering the differences of organic law, its conclusion that the power of removal was confined to the court of impeachment is, like that in the New Jersey case, not in conflict with the judgment of a majority of the Michigan court in *Dullam vs. Wilson*. Viewed in the light of the designated difference in the constitutions of Michigan and those of New Jersey and Kentucky, there is no real contrariety of views or judgment to be found in the opinions of the three courts, excluding, of course, Judge Campbell's opinion as to the necessity for action by a court where there is a special grant to the governor of power to remove, as in Michigan.

"That the grant of such a power as has been conferred upon the governor by the section under consideration invests him with the power to investigate and decide as to the existence of any of the causes for which a suspension of an officer may be made, seems

to us beyond controversy, in the light of common reason, which it is upon the authorities. Had it been the purpose that the suspension should take place only upon the ascertainment by the court, or other distinct tribunal, of the existence of the cause for suspension, it doubtless would have been made the necessary duty of the governor to suspend upon such ascertainment, or such ascertainment would have given the effect of working, *ipso facto*, a suspension. It would not have been left to the discretion of the governor to suspend or not, after the supposed tribunal had made its finding; nor would such finding have been subjected to the review and reversal which must be, and, as we understand are conceded to be, reserved to the governor in the power 'to reinstate the officer so suspended, upon satisfactory evidence that the charge or charges against him are untrue.' Certainly the only status which could be claimed for such court or tribunal would be that of merely an advisory body, and the governor would have an appellate or supervisory, but not an original, jurisdiction to ascertain the truth of the charges.

"The authorities are all to the effect that a grant of the power to remove, either for cause or at discretion, carries with it the exclusive power to hear and decide; and, whereas the courts are entirely powerless where the power is discretionary they are equally so where it is for cause, if the grantee of the power acts within its limits, and upon notice, if notice is required. If the removal is for cause designated by or falling within the grant, the grantee or depository of the removing power is the sole judge of the sufficiency of the evidence to justify the removal. That such is the case where the power is discretionary is settled by this court in *State vs. Ledwith*, 14 Fla., 220. In *State vs. Doherty*, 25 La. Ann. 119, where the executive power of removing the officer was 'for refusing or failing to do his duty as prescribed by this act', it was said: 'The grant of power to the executive to remove an officer for certain cause implies authority to judge of the existence of a cause. The power vested exclusively in executive discretion cannot be controlled in its exercise by any other branch of the government. * *

"The contention that the power of suspension can-

not be exercised by the governor for the reason that it is judicial is clearly untenable. It is true that the second article of our organic law divides the powers of government into three departments,—legislative, executive and judicial,—and declares that no person properly belonging to one department shall exercise any powers appertaining to either of the others, except in cases expressly provided for by this constitution."

In the case of *State in Complaint of Kennedy vs. McGarry*, 21 Wis., the court says:

"In this case two distinct causes for removal, incompetency and improper conduct, are specified in the statute; and both of them are charged and found to be true by the resolution. There can be no doubt, we think, that a charge in the words of the statute is sufficient. Besides these two, the resolution contains a third cause, namely, disobedience of the orders of the board. This, too, we deem sufficient. The statute makes it the duty of the inspector to comply with all such regulations, rules and by-laws as shall be prescribed or established by the board for the management, etc., of the house and of the persons confined there. * * * This disposes of all those parts of the answer in which the defendant seeks to go behind the action of the board, and to show that the causes for his removal did not exist or were different from those assigned. The decision of the board being final, no such defense can now be made.

"That part of the answer in which it is alleged that persons were examined and made statements before the board touching the charges made against the defendant, but without being sworn as witnesses, and that the defendant was not permitted to cross-examine them, is also irrelevant. It was certainly very proper for the board to notify the defendant of their intended proceedings, and to allow him to appear and take part in them, and to produce and examine witnesses, which it seems he did do; but the board was not bound to do so. It might have proceeded to order his removal *ex parte*, and without notice to him, and without any examination of witnesses, formal or otherwise; the

justice or injustice of the proceeding are not matters which can be examined here."

The case of *The State ex rel. Attorney General vs. Hawkins*, reported in 44 Ohio St. p. 98, was a proceeding in *quo warranto*. The facts briefly stated are that Morton L. Hawkins, Julius Reece and William A. Stephens, were, on April 4, 1885, appointed police commissioners of the city of Cincinnati by its board of public works; that they entered upon their duties as such commissioners and continued to act as such until February 3, 1886, when they were removed by the governor of the state, and the relator asks for a judgment of ouster. The defendants, Hawkins and Reece, filed a joint and the defendant, Stephens, a separate answer. The answers admitted the appointment and removal, and that the defendants continued to exercise the powers of police commissioners, but they deny that they had been lawfully removed or that the governor had power to do so. On the question of the power of the governor to hear and determine the charges against the defendants, it is held:

"In answer to the information, it is claimed by the respondents, that the governor had no power to remove them; and again, that if he had, it was not properly exercised.

"The first claim is upon the assumed ground that the power conferred on the governor by the statute to remove any of them for official misconduct, is judicial in its nature, and, though conferred by the act, can not be exercised as the judicial power of the state is, by § 1, of article 4, of the constitution, conferred upon the courts of the state only.

"This is not to be regarded as an entirely new question. It has been much discussed by the courts and writers, without being able to formulate any general rule upon the subject. What is judicial power cannot be brought within the ring-fence of a definition. It is undoubtedly power to hear and determine; but this is not peculiar to the judicial office. Many of the acts

of administrative and executive officers involve the exercise of the same power. Boards for the equalization of taxes, of public works, of county commissioners, township trustees, judges of election, viewers of roads, all, in one form or another, hear and determine questions in the exercise of their functions, more or less directly affecting private, as well as public rights of property and of person between private parties, is judicial, and can only be conferred on the courts. (*Merrill vs. Sherburne*, 1 N. H., 199). But such a definition does not necessarily include this case. The incumbent of an office has not, under our system of government, any property in it. His right to exercise it is not based upon any contract or grant. It is conferred on him as a public trust to be exercised for the benefit of the public. (5 N. E. Rep., 232). Such salary as may be attached to it is not given because of any duty on the part of the public to do so, but to enable the incumbent the better to perform the duties of his office by the more exclusive devotion of his time thereto. Official duties may, and in some instances are, imposed and required to be performed by the citizen, without any compensation whatever, where there is no constitutional provision requiring it. A public office and its creation is a matter of public, and not of private, law. The legislature had the power to provide for the creation of a board of police commissioners for cities of the grade and class of Cincinnati. This power carried with it as an incident of its exercise, the power to provide a mode of removal, unless restrained by some provision of the constitution, to the mere act of providing for the appointment of members of the board, which is not the case. * * *

"The power has been frequently, and wisely, exercised; and, so far as we can learn, has never been questioned in the courts. This section does not in terms extend to officers of municipal corporations; and for the obvious reason that, as already stated, such offcers have no recognized existence in the constitution. They are to be created and provided for by the legislature. Nor, is there any room for doubt that the legislature may, in providing for the organization of cities and villages, adopt the policy of the constitution contained in this section, in providing for

the removal of such municipal officers as it may, in the exercise of the power granted, provide shall be elected or appointed by cities and villages. Surely it may be inferred that, if the removal of a county or township officer, for cause, does not involve the exercise of judicial power, within the meaning of § 1, art. 4, and that it may be reposed elsewhere than in a court, there is the fullest warrant for saying, that the same is true as to the removal of municipal officers, created by the legislature.

"The view here taken will be found sustained not only by the decisions of this court, but also by those of other states, of weight and respectability.

"In *The State ex rel. vs. Harmon*, 31 Ohio St. 250, the nature of judicial power was considered by Judge White. The case involved the validity of the power conferred by statute upon the senate to hear and determine the contested election of a judge. It was argued with much ability and earnestness by counsel for the respondent, that such power could not be conferred on that body, citing and relying on § 1, art. 4, in connection with § 32, art. 2, of the constitution, the former conferring judicial power on the courts, and the latter prohibiting the exercise, by the legislature, of any such power not expressly conferred. But the court held that the power conferred on the senate was not judicial power within the meaning of § 1, art. 4. The following is a part of the language used by Judge White in delivering the opinion of the court: 'That the senate is not a court established under the judicial article of the constitution, is plain. Hence, if the trial of contested elections is necessarily the exercise of judicial power, within the meaning of that article, authority to try such cases cannot be conferred upon the senate. The distribution of powers among the legislative, executive and judicial branches of the government, is, in a general sense, easily understood; but no exact rule can be laid down, *a priori*, for determining, in all cases, what powers may or may not be assigned by law to each branch. * * * What constitutes judicial power, within the meaning of the constitution, is to be determined in the light of the common law and of the history of our institutions as they existed anterior to and at the time of the adoption of

the constitution. Whether power, in a given instance, ought to be assigned to the judicial department, is ordinarily determinable from the nature of the subject to which the power relates. In many instances, however, it may appropriately be assigned to either of the departments. It is said authority to hear and determine a controversy upon the law and fact is judicial power. The authority to ascertain facts, and to apply the law to the facts when ascertained, appertains as well to the other departments of the government as to the judiciary. Judgment and discretion are required to be exercised by all the departments. The exercise of the power of eminent domain vested in county and township boards and in corporations, is not the exercise of judicial power, within the meaning of the constitution; while the exercise of the same power by the courts, if vested in them, would be judicial. * * * Tt is claimed that a distinction should be taken in the cases where the power of appointing and removing are reposed in one and the same person, and where it is reposed in different persons. We are aware that this distinction exists in the facts of some of the cases, but we are not aware that any distinction in principle has been based upon it. Whether the person removed was or was not appointed to his office by the official that is vested with the power to remove, cannot, as we see, change the essential character of the power of removal.'

"It is also claimed that a distinction should be taken between the case where an appointment to an office is made to be held by the appointee at the pleasure of the appointing power, and where it is with a provision for removal for misconduct. But there is none in principle, so far as the right to remove is concerned. The office, in either case, is held subject to the terms upon which it was created, and the mode of removal prescribed. As it may be so created, as that the incumbent shall hold at the pleasure of the appointing power, then, for a stronger reason, the appointment may be made to depend upon removal for cause, irrespective of where the power to remove may be lodged. The manner of filling and vacating the office being unaffected by constitutional provisions, the manner prescribed by the legislature must

prevail in either case.   It is a strange sort of logic which reaches the result, that the office may be accepted in the manner prescribed by the legislature, and the mode of removal rejected."

In *Wilcox, ex rel. vs. The People, ex rel.*. 90 Ills. 186, the court holds:

"It being found that the power of removal existed in the governor, the inquiry remains whether it was validly exercised.   Relators say not—that the power granted was judicial in its nature, and should have been exercised according to judicial methods, that is, there should have been a specific charge, notice of it, opportunity for defense and hearing, and proof to support the charge.   Undoubtedly the governor can only remove for some one of the causes specified; but the removal here was for one of these causes—incompetency.    The governor ascertained the existence of the cause here, and made the removal on account of it. The constitution is silent as to who shall ascertain the cause of removal or mode of its ascertainment.    It simply gives to the governor the power to remove any officer whom he may appoint, in case of incompetency, etc.    It follows, then, that it is with the governor, who is to act in the matter, to determine, himself, whether the cause of the removal exists, from the best lights he can get, and no mode of inquiry being prescribed for him to pursue, it rests with him to adopt that method of inquiry and ascertainment as to the charge involved which his judgment may suggest as the proper one, acting under his official responsibility, and it is not for the courts to dictate to him in what manner he shall proceed in the performance of his duty, his action not being subject to their revision."

In *Warner vs. Meyer*, 4 Oregon 72, the court, discussing this question, says:

"The principal question of fact to be ascertained in this proceeding is, what was the decision of the board of canvassers?   To whom did that board award the certificate of election?   It was the duty of that board to decide that question in the first instance, and the correctness of its decision cannot be inquired into in this proceeding.   Its decision, although erroneous in

point of law or fact, must stand until reversed and set aside by a competent tribunal, and in a proceeding where its correctness may be inquired into."

Throop, in his work on public officers, after a thorough review of all the authorities, announces the true rule to be:

"Courts will not interfere, if the moving body is vested with discretion. It is well settled, that where the removing officer or body is vested with discretion in the particular case, the courts will not interfere with the exercise of that discretion. Thus, as was stated in a previous section, where an officer is removed because his services are no longer needed, or to diminish the expenses, or for similar reasons resting in the discretion of the removing authority, he has no remedy in the courts. So, where the proceedings have been taken in accordance with the statute, and the cause alleged is one for which the officer may be removed, but the proof shows that the delinquency was in a small matter, it is for the removing officers to determine whether the delinquency was sufficiently grave to require the removal, and the courts will not interfere, because the punishment seems to be disproportionate to the offense. So, where the charter of a city provided that the officers of the fire department should retain their positions, as long as they discharged their duties properly 'and satisfactorily to the said fire commissioners,' and should not be removed for political sentiments, etc., it was held, that the statute vested the fire commissioners with the sole power to determine whether a cause for removal had occurred; that the matter rested in their own discretion and judgment, which could not be reviewed by an appeal to any other tribunal; and that a *mandamus* to restore a removed officer will not lie, where the power of removal rests in discretion, or depends upon the exercise of personal judgment, even if it was exercised maliciously or dishonestly; but in the latter case the commissioners will be answerable for corrupt action. So, the courts will not review the exercise of a power of removal, where, in the opinion of the board vested with such power, the misconduct was sufficient for removal, 'except in the clearest case of abuse.'

"Power of removal 'for cause' vests discretion. So it has been held that where a statute gives a power of removal 'for cause,' without any specification of the causes, this power is of a discretionary and judicial nature; and unless the statute otherwise specially provides, the exercise thereof cannot be reviewed by any other tribunal, with respect either to the cause, or to its sufficiency or existence, or otherwise. Under similar statutory provisions, and even in some cases where the statute specifies the causes of removal, it has been ruled, in other American decisions, that the removing authority is the sole and exclusive judge of the cause, and the sufficiency thereof; and the courts cannot review its decision in any case where it had jurisdiction." (Secs. 394 and 396.)

A late case of *Trimble vs. People*, decided by the supreme court of Colorado and reported in 34 Pac. Rep. 981, was an action for the usurpation of the office of police commissioner of the city of Denver. The relator, Phelps, had been appointed by the governor of the state, by and with the advice and consent of the senate, police commissioner of the city of Denver. He was afterwards removed by the governor, and Trimble appointed to fill the vacancy. Judgment was rendered in the district court for the relator, and the respondent appealed the case to the supreme court. The statute under which the governor acted is comparable to that of our own territory. Chief Justice Hayt, after considering the various questions raised, uses the following language in conclusion:

"Experience has demonstrated that the power of removal must be lodged somewhere, and the fact that the power exists and may be exercised as occasion requires, carries with it the possibility that the power may not always be wisely used. But if this is to be taken as a conclusive argument against the power, it applies as well to all investiture of authority, and would overthrow government itself. * * * In this instance the cause stated does not import any wrong-doing to the offier, and while it may not be such as would have had weight with a court, it was deemed

sufficient by the governor, and his judgment is final and decisive. The office of police commissioner is created by the statute. It was accepted by the relator under the conditions imposed by the act, among which was that the incumbent should hold it subject to removal by the governor for cause. Under the statute the cause that may be sufficient to warrant removal is to be determined by the governor, and no mode of inquiry being prescribed, he is at liberty to adopt such mode as to him shall seem proper, without interference on the part of the courts. The governor was not bound to examine witnesses under oath or otherwise, although it was eminently proper that he should do so. He might have resorted to other means of ascertaing whether a cause of removal existed. And the refusal to allow counsel is not fatal to the governor's action, as he might have proceeded ex parte. The governor having determined that a sufficient cause for removal existed, and having exercised the power confided to him, relator is without remedy in this proceeding. It is the duty of the court to uphold the executive power as it has been conferred by the legislature."

We think, from the foregoing authorities, it is very plain that the hearing and removal by the governor of the defendant was not such a hearing as would bring it within the constitutional prohibition. That the authorities may be readily ascertained, we give a partial list:  *State vs. McGarry*, 21 Wis., 496; *State vs. Prince*, 45 Wis., 610; *Donahue vs. Will*, 100 Ill., 99; *Warner vs. Meyers*, 4 Or., 72; *Keenan vs. Common Council*, 9 Wis., 254; *State vs. Frazier*, 48 Ga., 137; *Patterson vs. Vaughan*, 39 Ark., 211; *Exparte Ramshay*, 18 Adol. and E. (N. S.), 173; *State ex rel. Attorney General vs. Johnson*, vol. 11 South. Rep., 845; *Dullam vs. Wilson*, 19 N. W., 112: *Taft vs. Adams*, 3 Gray, 126; *Ex parte Wiley*, 54 Ala., 226; *Dangan vs. Dist. Court Lake Co.*, 22 Am. L. Reg. (N. S.), 528; *State ex rel. Attorney General vs. Hawkins*, 44 Ohio St. 98; *State vs. Peterson*, 52 N. W. Rep., 655; *Sweeney vs. Stevens*, 46 N. J. L., 344: *State ex rel. Warrell vs. Peellee*, 124, Ind., 515; *People ex rel. Gere vs. Whit-*

*lock*, 92 N. Y., 191: *Ex parte Hennen*, 13 Peters, 141; Throop on Pub. Officers, §§ 394 to 396; *Ewing vs. Turner*, 35 Pac. 957; *State vs. Harmon*, 31 Ohio St. 250.

A line of reasoning that would render a statute a dead letter when otherwise it would effectuate the purpose intended is certainly unsound. If, as the defendant avers, the courts must determine the cause of removal, the statute conferring upon the governor that power would be useless, as a judgment of a court of competent jurisdiction would vacate the office, and then, as a matter of course, the governor could fill the vacancy, unless the further contention of the defendant, that even if thus empowered he is still powerless to fill a vacancy without the advice and consent of the territorial council, be true. Our satutes, however, are so plain upon the right of the governor to fill the vacancy, that we are surprised that any contention should be raised upon this proposition. By the removal of the defendant, it must follow, *ipso facto*, the office of superintendent of public instruction and ex-officio auditor, became vacant. Section 5878 of the Statutes of 1893, as stated, provided that when a vacancy shall occur in the office of the territorial superintendent of public instruction, by death, resignation or otherwise, the governor shall appoint, as soon as practicable, some person to fill the vacancy, and that the person receiving such appointment shall qualify as required by law before entering upon the discharge of the duties of the office, and shall hold his office until his successor is appointed and qualified, and § 5975 provides that in case a vacancy should occur in any territorial office when the legislative assembly is not in session, the governor shall make a temporary appointment until the next session of the legislature, when he shall nominate some person to fill such office, and if confirmed by the council, the person so nominated shall hold the office during the

remainder of the term and until his successor shall be appointed and qualified. Section 5976 declares that the governor shall have power to remove any officer so appointed by him, in case of incompetency, neglect of duty, or malfeasance in office; and may then fill the same as provided in cases of vacancy.

When a vacancy shall occur in the office by death, resignation or otherwise, the governor shall appoint some person to fill the vacancy. It will hardly be contended that, after defendant was removed, that the office was not vacant. If the office was vacant how can it be said in reason that the governor had not the power to fill the vacancy? This proposition is so plain that it would be useless for us to discuss it further.

There is nothing in our organic law repugnant to the power of the governor to hear and determine the charges against a public officer, where the legislature confers upon him the power of removal, and in the absence of such a provision, the enactment must prevail. The legislative assembly created the office of territorial superintendent of public instruction and ex-officio auditor, and it would be strange reasoning to hold, in the absence of any constitutional prohibition, the legislative assembly could not also designate when the term of office should expire, the salary be changed, or the cause for removal. The defendant accepted the office under a statutory provision creating it, and accepted the salary as provided by the legislature, but now objects to the statutory provisions relating to his removal. Can he blow both hot and cold; accept the one and reject the other; take that which pleases him and reject that which does not, when both come from the same source? It seems to us clearly not. The legislative assembly evidently in their wisdom recognized that perhaps some officials might prove unworthy of their trust, and provided speedy means for their removal. Shall this court now

say that they did not have any right to do so?  If the law is constitutional, and we think it is, we must lend it our assistance when those aggrieved present themselves.  Not being ꞏa legislative body, we can only interpret and aid in the enforcement of the law as enacted.  We think the law a wise one and the enactment a rightful subject of legislation.  It protects the bondsmen of dishonest officials, as well as the public service and provides a plain speedy remedy to relieve a corrupt official of his trust.  Its policy or wisdom, however, is not with the court, but the legislature.

Our organic and statutory law obliges the governor to see that the laws are faithfully executed, and in removing an officer for incompetency, neglect of duty or malfeasance, he acts under his official oath to support, protect and defend the constitution and laws, and is responsible to the people for the faithful execution of his high office, and whether wisely or unwisely administered, the source of such responsibility is the same.

Under the reasoning and authority thus laid down, the peremptory writ must be awarded.  It is so ordered.

Bierer, J., and McAtee, J., concurring; Dale, C. J., and Burford, J., dissenting.